226 F.3d 108 (2nd Cir. 2000)
 STEVEN GRAVATT and DELORES GRAVATT, Plaintiffs-Appellees, v.
THE CITY OF NEW YORK, Defendant-Cross-Claimant,
SIMPSON & BROWN, INC., Defendant-Cross-Defendant-Appellant,
N. MASSAND, P.E., L.S., P.C., a/k/a/ Nanik Massand, P.C., Defendant-Cross-Claimant-Cross-Defendant,
BARGE "ABC" and BARGE "DEF", their Engines, Boilers, Tackles, etc. in rem, Defendant-Cross-Defendant.
 Docket No. 99-7898
August Term, 2000
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: April 27, 2000
Decided: September 18, 2000
 
 Plaintiff, employed as a dock builder, was injured on a barge while working on a mid-river bridge repair project. His employer on the construction project was also the statutory owner of the barge. He and his wife brought a personal injury suit against his employer in its capacity as vessel owner under section 5(b) of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), as amended 33 U.S.C. § 905(b). After bench trial, the United States District Court for the Southern District of New York (Robert W. Sweet, Judge) entered judgment in favor of both husband and wife plaintiffs for $2,024,529.73 and $230,327.75 respectively. The employer appealed.
 The Court of Appeals, Leval, J., holds: (1) employee covered by LHWCA may recover in a 905(b) negligence suit against his employer who is also the vessel owner, but only to the extent that the employer was negligent in its capacity as a vessel; (2) because the negligence of the employer was in its capacity as employer and not in its capacity as vessel, the employer is not liable in tort under section 905(b).
 Judgment REVERSED.[Copyrighted Material Omitted]
 JOHN J. WALSH, Freehill, Hogan & Mahar, LLP, New York, NY, for Appellant.
 NICHOLAS P. GIULIANO, Waesche, Sheinbaum & O'Regan, P.C., (William R. Bennett, III and Claurisse C. Orozco, on the brief), New York, NY, for Appellees.
 Before: JACOBS, LEVAL and SACK, Circuit Judges.
 LEVAL, Circuit Judge:
 
 
 1
 Defendant Simpson & Brown, Inc. ("S&B") appeals from the final judgment of the United States District Court for the Southern District of New York (Robert W. Sweet, Judge) entered against it on July 6, 1999. Plaintiff Steven Gravatt ("Gravatt") was employed as a journeyman dock builder by defendant S&B-the sole appellant-a construction contractor retained by the City of New York to repair one of its bridges. Gravatt was injured while working on a barge chartered by S&B at this mid-river construction site. Gravatt's employment made him a "harbor-worker"-a person covered by the terms of the Longshore and Harbor Workers' Compensation Act of 1972 ("LHWCA"), as amended, 33 U.S.C. §§ 901 et seq. Under the definitions of the LHWCA, S&B acted in two capacities-first, as Gravatt's employer, see 33 U.S.C. § 902(4), and second, as the owner of the vessel on which Gravatt was injured, see id. § 902(21).
 
 
 2
 We must decide whether S&B's conduct renders it liable to Gravatt in tort given that it acted in this dual capacity of employer and vessel owner. The LHWCA provides that as Gravatt's employer, S&B was required to pay Gravatt statutory compensation for injuries suffered in the course of his employment, regardless of fault, see 33 U.S.C. § 904, but that an employer's no-fault liability for compensation to its employee under section 904 is "exclusive and in place of all other liability." Id. § 905(a). Therefore, Gravatt has no tort remedy against S&B in its capacity as his employer. On the other hand, the injured employee's receipt of compensation from his employer does not bar him from suing responsible third parties. See 33 U.S.C. § 933(a). In this regard, the LHWCA provides that, with certain exceptions, an injured maritime worker may bring an action for negligence against a vessel as a third party. See 33 U.S.C. § 905(b). The statute implies, and has been interpreted to provide, that an employer that is also a vessel owner can be liable to its employees as if it were a third party for negligence in its vessel capacity. We must decide how to reconcile S&B's section 905(a) immunity as employer to suit in negligence, with its potential liability in negligence as a vessel under section 905(b).
 
 
 3
 The district court found Gravatt liable under alternate theories. First, relying on its reading of Fanetti v. Hellenic Lines Ltd., 678 F.2d 424 (2d Cir. 1982), it concluded that S&B was liable in negligence to Gravatt regardless "whether the acts of negligence are attributable to the owner-employer in its capacity as [vessel] owner or as employer." Gravatt v. City of New York, 53 F. Supp. 2d 388, 424 (S.D.N.Y. 1999). Second, the district court found that S&B's negligence was in its capacity as vessel owner. See id. at 421-24. In our view, a dual-capacity employer-vessel is liable to its covered employees under section 905(b) only to the extent that it breached its duties of care in its capacity as vessel, and is not liable for negligence committed in its capacity as employer. Accord Morehead v. Atkinson-Kiewit, J/V, 97 F.3d 603 (1st Cir. 1996) (en banc); Levene v. Pintail Enters., 943 F.2d 528 (5th Cir. 1991); Castorina v. Lykes Bros. S.S. Co., 758 F.2d 1025 (5th Cir. 1985); see also Smith v. Eastern Seaboard Pile Driving, Inc., 604 F.2d 789, 795 (2d Cir. 1979) (holding that the "key issue" in a dual-capacity case was whether negligent employees acted "in their capacity as agents of the vessel on the one hand or as employees performing [LHWCA-covered harbor work] on the other"). Because we find that S&B was not negligent in its vessel capacity, we reverse the judgment against S&B.[1]
 
 BACKGROUND
 A. Facts
 
 4
 The facts of the case are set out in detail in the several opinions below, in particular the court's opinion on the parties' summary judgment motions, see Gravatt v. City of New York, No. 97 CIV 0354(RWS), 1998 WL 171491 (S.D.N.Y. Apr. 10, 1998), and in two post-trial opinions, see Gravatt v. City of New York, 1999 WL 111922 (S.D.N.Y. Mar. 3, 1999) ("Original Opinion"); Gravatt v. City of New York, 53 F. Supp. 2d 388 (S.D.N.Y. 1999) ("Revised Opinion"). The following facts relevant to this appeal are as found by the district court.
 
 
 5
 Gravatt and his wife Delores sued the City of New York (the "City"), N. Massand, P.C. ("Massand"), and S&B for injuries that Gravatt sustained in an accident on January 31, 1996, while he was working on a construction project repairing the 145th Street Bridge across the Harlem River. The City owned the bridge. Massand-a New York professional corporation-was the engineering firm retained by the City to design the bridge repair project, supervise the construction, and monitor that the repair work was carried out safely. S&B was the construction contractor hired to perform the repair work under the supervision and control of Massand and the City. Gravatt was employed by S&B.
 
 
 6
 The repairs to the 145th Street Bridge involved the demolition and replacement of the bridge's "fender systems"-the wooden, pier-like structures that surround a bridge's mid-river stanchion in order to protect it in case of collision with shipping. The repairs required the removal of the old fender system, the excavation of the river-bed, and the driving of new piles, on which the new fender system could be constructed. This mid-river construction work required the use of several barges, which S&B had chartered to perform the work. A crane barge carried the heavy equipment used to extract the old piles, drive new piles, and excavate the river-bed. Materials barges were used to transport new materials, consisting primarily of piles, braces and whalers to the site from Newark, New Jersey, and to transport debris-primarily old timbers-to Newark for disposal. The crane was used to unload new materials from the materials barges and to load them with debris. When a barge loaded with new materials arrived at the site, it would be lashed to the crane barge. As work progressed, the new materials would be offloaded from the barge and debris loaded in their place. When this was accomplished, the materials barge would be towed back to Newark to dispose of the debris and repeat the cycle.
 
 
 7
 Gravatt's duties as a dock builder required him to spend nearly all his time working directly on the fender system of the bridge. He spent less than one percent of his time on the barges.[2] His normal duties did not include handling materials on the barges. The discharging of the new materials and the stowing of the debris on the barges was usually performed by a "deck man."
 
 
 8
 On January 31, 1996, however, Gravatt, together with a fellow dock builder, Liming, was instructed by the site foreman Holzheuer to go onto a materials barge to help move old piles so as to clear access to new materials. The debris had been loaded on top of new materials, obstructing access to them. The loading of debris on top of new materials violated S&B's safety policies as set out in its safety handbook. This storage decision had been Holzheuer's. It is not disputed furthermore that Holzheuer instructed Gravatt and Liming to move the old piles in an unsafe and negligent manner. Standard industry practice requires the use of a "choker" to move piles. A "choker" is a chain, which is wrapped around the pile, the noose tightening as the crane lifts the chain. "Timber tongs" are used to raise the pile two or three feet onto a "sleeper," which provides enough clearance from the deck to allow the choker to be attached around the pile. Holzheuer, however, instructed Gravatt and Liming to use the timber tongs, rather than the choker, to move piles. There was evidence that S&B routinely engaged in this misuse of timber tongs, in violation of industry-wide safety standards.[3]
 
 
 9
 Gravatt and Liming stood on the material barge. The crane operator and deck man were on the crane barge. The crane barge was secured to the fender system; the material barge was lashed to the crane barge. The crane operator could not see Gravatt who stood on the debris material some 60 to 70 feet away from him. Gravatt climbed over the debris to attach the timber tongs to a twelve-foot piling. Liming gave a signal, which the crane operator interpreted as a signal to hoist. Liming did not use the signals specified in S&B's safety handbook.
 
 
 10
 At this point Gravatt had climbed back onto the new lumber, some eight feet above the deck of the barge, and was facing away from the raised piling. As the crane raised the pile some 10 feet into the air, the lower end of the pile snagged on debris on the barge. The pile slipped from the teeth of the timber tongs, and fell, hitting another pile, which bounced up and struck Gravatt on the back of his legs. Gravatt was knocked some twenty-five feet into the near-freezing water of the Harlem River.
 
 
 11
 Gravatt was seriously injured and has undergone several operations on his legs. He has received the statutory compensation payments from S&B due under the LHWCA.
 
 B. Relevant Prior Proceedings
 
 12
 A bench trial was held from November 30 through December 4, 1998. On March 3, 1999, the district court issued an opinion ruling in favor of the Gravatts on their state labor law claims against the City and Massand, pursuant to N.Y. Labor Law §§ 200(1), 240, 241(6), and on their federal claim against S&B, pursuant to section 5(b) of the LHWCA, 33 U.S.C. § 905(b). See Gravatt, 1999 WL 111922, at *21-*31. Gravatt was held to have been one-third contributorily negligent. See id. at *19, *32. The court awarded punitive damages against Massand, but held that punitive damages could not be awarded against S&B as a matter of law under the LHWCA. See id. at *33.
 
 
 13
 The Gravatts filed a motion to amend, pursuant to Fed. R. Civ. P. 52(b). On May 24, 1999, the district court granted the motion and filed a revised opinion. See Gravatt, 53 F. Supp. 2d 388. The revised opinion reversed the court's rulings that Gravatt was contributorily negligent, see id. at 392-94, and that punitive damages were not available in a tort action under section 905(b), see id. at 394-397.
 
 
 14
 Judgment was entered on July 6, 1999, in favor of Gravatt and his wife against S&B in the total amount of $2,254,857.48, plus post-judgment interest and costs. As against Massand and the City a similar judgment was not reduced to a single amount, but was structured pursuant to New York's structured judgment statute, see N.Y. CPLR 50-B, which requires that part of the judgment be paid out over time. The three defendants were held jointly and severally liable for all amounts due under the judgment, with the exception of the punitive damages entered separately against Massand and S&B, for which they were held severally liable.
 
 
 15
 After the judgment was entered, on July 16, 1999, the City and Massand settled with the Gravatts, paying $1,350,000 in exchange for general releases from the Gravatts and a partial satisfaction of judgment. S&B then moved pursuant to Fed. R. Civ. Proc. 59(e) to amend the July 6 judgment entered against it by reducing the judgment by the $1,350,000 received by the Gravatts in their settlement with the City and Massand. On November 5, 1999, the district court denied the motion. See Gravatt v. City of New York, 73 F. Supp. 2d 438, 440-41 (S.D.N.Y. 1999).
 
 
 16
 S&B appeals from the judgment and from the order denying its Rule 59(e) motion to amend the judgment. We reach only the issue whether S&B was liable under section 905(b).
 
 DISCUSSION
 
 17
 S&B contends on appeal that the district court improperly held it liable for vessel negligence under LHWCA § 5(b), 33 U.S.C. § 905(b). It does not dispute that it was negligent in its capacity as employer and that Gravatt was injured by reason of that negligence,[4] but denies it was negligent in its capacity as vessel owner. The district court held S&B liable under alternate theories. First, citing Fanetti v. Hellenic Lines Ltd, 678 F.2d 424 (2d Cir. 1982), the court ruled that any negligence on the part of a dual-capacity employer-vessel owner is actionable under section 905(b), regardless whether the negligence was committed in its capacity as vessel owner or in its capacity as employer. See Gravatt, 53 F. Supp. 2d at 424. Second, citing Morehead v. Atkinson-Kiewit, J/V, 97 F.3d 603 (1st Cir. 1996), and Smith v. Eastern Seabord Pile Driving, Inc., 604 F.2d 789 (2d Cir. 1979), the district court found that, in any case, S&B was negligent in its vessel capacity. See Gravatt, 53 F. Supp. 2d at 421-24. S&B argues that its negligence was only in its role as Gravatt's employer and not in its role as vessel owner, and that, as Gravatt's employer, its liability was limited to the statutory workers' compensation payments required by the LHWCA. See 33 U.S.C. §§ 904, 905(a). We agree that S&B can be held liable under 905(b) only for negligence in its role as vessel and that no such negligence was shown. We therefore reverse the judgment.
 
 
 18
 1. Vessel liability under section 905(b) of the LHWCA .
 
 
 19
 LHWCA is a comprehensive workers' compensation system, under which employers are required to compensate covered employees injured in the course of their employment, regardless of fault. In relevant part, section 4 of the LHWCA provides:
 
 
 20
 (a) Every employer shall be liable for and shall secure the payment to his employees of the compensation payable under sections 907, 908, and 909 of this title. . . .[5]
 
 
 21
 (b) Compensation shall be payable irrespective of fault as a cause for the injury.
 
 
 22
 33 U.S.C. § 904. It is not disputed that Gravatt's employment was as a "harbor-worker" covered by the LHWCA, see 33 U.S.C. § 902(3),[6] and that S&B was his "employer," see id. § 902(4).[7]
 
 
 23
 Like most state workers' compensation schemes, the LHWCA provides that the statutory, no-fault compensation payments are the employer's exclusive liability to its employees when they are injured in the course of their employment. "The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee . . . ." 33 U.S.C. § 905(a). The employee is, therefore, barred from suing his employer in tort. See Moragne v. State Marine Lines, Inc., 398 U.S. 375, 394 n.11 (1970). On the other hand, as with most state workers' compensation schemes, the employee may sue negligent third parties in tort, notwithstanding his entitlement to no-fault compensation provided by the employer. See 33 U.S.C. § 933(a) ("If . . . the person entitled to . . . compensation determines that some person other than the employer . . . is liable in damages, he need not elect whether to receive such compensation or to recover damages against such third person."). In particular, under section 905(b), in accordance with section 933, an employee may bring an action in negligence against the "vessel as a third party." 33 U.S.C. § 905(b). It is undisputed that S&B, as owner or charterer of the crane barge and charterer of the materials barges, falls within the statutory definition of "vessel." See 33 U.S.C. § 902(21).[8]
 
 
 24
 The question presented by this case is whether, and under what circumstances, S&B can be liable to its employee for its negligence given its dual-capacity as employer (enjoying immunity from tort liability under section 905(a)) and vessel owner (against which liability for negligence may lie under section 905(b)).
 
 
 25
 This question requires an understanding of the significant amendments to the LHWCA enacted by the Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972, Pub. L. No. 92-576, 86 Stat. 1251 (hereafter "1972 Amendments"). Prior to 1972, the exclusivity of the employer's liability under section 905 had been severely undermined as a result of two Supreme Court decisions. See generally H.R. Rep. No. 92-1441 (1972), reprinted in 1972 U.S.C.C.A.N. 4698. First, in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 95-96 (1946), the Supreme Court held that longshoremen and other employees covered under the LHWCA, who were injured while working on a vessel, were entitled to maintain an action against the vessel, as a third party, based on the theory of unseaworthiness-a doctrine of strict liability. Under Sieracki, vessels were liable as third parties to longshoremen for injuries resulting from the vessels' "unseaworthy" condition. An action for unseaworthiness had previously been available only to seamen.[9] Because the responsibility of a vessel to be in seaworthy condition calls for strict liability, regardless of fault, the vessel could be liable to longshoremen, notwithstanding that the unseaworthy condition may have been caused by the stevedore and not by the vessel's crew. See H.R. Rep. No. 92-1441, 1972 U.S.C.C.A.N. at 4702; see also Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 164-65 (1981).
 
 
 26
 Second, in Ryan Stevedoring Co. v. Pan Atlantic S.S. Corp., 350 U.S. 124, 132-35 (1956), the Supreme Court held that the vessel could seek indemnity from the stevedore-employer for the vessel's liability to an injured longshoreman-employee for unseaworthiness, based on the theory that the stevedore had breached an express or implied warranty of workmanlike performance to the vessel. In this manner, the stevedore-employer became indirectly liable in maritime tort to its injured longshoreman-employee under the no-fault doctrine of unseaworthiness, notwithstanding that the LHWCA provided that the stevedore-employer's exclusive liability to its injured employees was for the statutory compensation payments. See 33 U.S.C. §§ 904, 905(a). In effect, the injured employee could get tort damages from his employer despite the statutory proscription against suing his employer directly.[10]
 
 
 27
 The 1972 Amendments made substantial changes to this framework. The statutory compensation benefits provided under the LHWCA were substantially increased. See Northeast Marine Terminal Co. v. Caputo, 432 U.S. 249, 261-62 (1977). At the same time, section 5(b) of the LHWCA, 33 U.S.C. § 905(b), was amended to overrule Sieracki and Ryan. See Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 262 (1979). The longshoreman-employee's right to recover for unseaworthiness was abolished; his right to recover from the vessel was preserved but was limited to an action for negligence; and the vessel owner's right to indemnity from the stevedore was abolished. See Scindia, 451 U.S. at 165. Under these amendments, section 905(b) provided in relevant part:
 
 
 28
 In the event of injury to a person covered under this Act caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party . . . and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing shipbuilding or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this Act.
 
 
 29
 33 U.S.C. § 905(b) (as in effect in 1972).
 
 
 30
 In two respects, these 1972 Amendments expressly addressed the dual-capacity problem that arises where the covered maritime worker is employed by the owner of the vessel on which (or by which) he is injured, rather than employed by a contractor that is independent of the vessel. See H.R. Rep. No. 92-1441, 1972 U.S.C.C.A.N. at 4705. The second sentence of § 905(b) relieves a dual-capacity vessel of negligence liability to a worker "employed by the vessel to provide stevedoring services . . . if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel." Similarly, the third sentence of section 905(b), as in effect in 1972, provided that a person employed directly by the vessel to provide shipbuilding or repair services had no cause of action against the vessel for injuries caused by the negligence of others providing the same services. See id. In 1984, Congress further amended section 905(b) (the "1984 Amendments") to broaden the vessel's immunity from liability for negligence in the case of certain classes of employees. As the result of this amendment, the third sentence of Section 905(b) now provides that:
 
 
 31
 If such person was employed to provide shipbuilding, repairing, or breaking services and such person's employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel, no such action shall be permitted, in whole or in part or directly or indirectly, against the injured person's employer (in any capacity, including as the vessel's owner, owner pro hac vice, agent, operator, or charterer) or against the employees of the employer.
 
 
 32
 Longshore and Harbor Workers' Compensation Act Amendments of 1984, Pub. L. No. 98-426, § 5(a)(1), 98 Stat. 1639, 1641. Thus, under the 1984 Amendments, maritime workers engaged directly by a vessel owner to provide shipbuilding, repairing or breaking services cannot sue the dual-capacity employer for injuries caused by the negligence of the vessel or its employees, no matter what were the work activities of the negligent employees.
 
 
 33
 In amending section 905(b) Congress clearly intended that the "vessel's liability is to be based on its own negligence." See H.R. Rep. No. 92-1441, 1972 U.S.C.C.A.N. at 4704 (emphasis added); see also id. ("The vessel will not be chargeable with the negligence of the stevedore or employees of the stevedore."). However, Congress "did not specify the acts or omissions of the vessel that would constitute negligence." Scindia, 451 U.S. at 165. The House Committee Report on the 1972 Amendments conceded that the contours of the action for vessel negligence under 905(b) were to be worked out by federal courts "through the application of accepted principles of tort law and the ordinary process of litigation-just as they are in cases involving alleged negligence by land-based third parties." H.R. Rep. No. 92-1441, 1972 U.S.C.C.A.N. at 4704. At the same time, through the Committee Report, Congress provided substantial guidance as to the principles that should shape the evolution of the action.
 
 
 34
 First, the House Committee specified that the employee's rights and the vessel's liability under a 905(b) action for vessel negligence should approximate those of a land-based employee and a land-based third party.
 
 
 35
 The Committee intends that on the one hand an employee injured on board a vessel shall be in no less favorable position vis a vis his rights against the vessel as a third party than is an employee who is injured on land, and on the other hand, that the vessel shall not be liable as a third party unless it is proven to have acted or have failed to act in a negligent manner such as would render a land-based third party in non-maritime pursuits liable under similar circumstances.
 
 
 36
 H.R. Rep. No. 92-1441, 1972 U.S.C.C.A.N. at 4704 (emphasis added).
 
 
 37
 Second, the 905(b) action was to be developed as a matter of uniform federal maritime law, not by incorporating the tort law of the particular state in which the action arose. See id. at 4705 ("[T]he Committee does not intend that the [section 905(b) action] shall be applied differently in different ports depending on the law of the State in which the port may be located . . . [but] that legal questions . . . shall be determined as a matter of Federal law."). In particular, the Report specified that
 
 
 38
 the Committee intends that the admiralty concept of comparative negligence, rather than the common law rule as to contributory negligence, shall apply in cases where the injured employee's own negligence may have contributed to causing the injury. Also, the Committee intends that the admiralty rule which precludes the defense of "assumption of risk" in an action by an injured employee shall also be applicable.
 
 
 39
 Id. at 4705.
 
 
 40
 Third, by eliminating the no-fault action of unseaworthiness against the vessel and increasing the level of statutory compensation recoverable from the employer, the 1972 Amendments intended "to shift more of the responsibility for compensating injured longshoremen to the party best able to prevent injuries: the stevedore-employer." Howlett v. Birkdale Shipping Co., 512 U.S. 92, 97 (1994); see also H.R. Rep. No. 92-1441, 1972 U.S.C.C.A.N. at 4699 ("[A]dequate workmen's compensation benefits[,] . . . by assuring that the employer bears the cost of unsafe conditions, serve[] to strengthen the employer's incentive to provide the fullest measure of on-the-job safety."). Recognizing that Congress conceived statutory compensation payments "as the usual source of making the [covered employee] whole," we have cautioned that "[c]ourts must be exceedingly careful in defining the contours of the [covered employee's] action for negligence against the ship . . . lest too expansive notions of the ship's duty vitiate Congress' intent to do away with absolute liability for vessels . . . and make greatly improved compensation benefits the primary remedy for longshoremen and harbor workers." Canizzo v. Farrell Lines, Inc., 579 F.2d 682, 688, 687 (2d Cir. 1978) (Friendly, J., dissenting).
 
 
 41
 Fourth, and important for our case,
 
 
 42
 the Report specifies as to "dual-capacity" cases, the rights of an injured longshoreman . . . should not depend on whether he was employed directly by the vessel or by an independent contractor. Accordingly, the bill provides in the case of a longshoreman who is employed directly by the vessel there will be no action for damages if the injury was caused by the negligence of persons engaged in performing longshoring services. . . . The Committee's intent is that the same principles should apply in determining liability of the vessel which employs its own longshoremen . . . as apply when an independent contractor employs such persons.
 
 
 43
 H.R. Rep. No. 92-1441, 1972 U.S.C.C.A.N. at 4705 (emphases added). As the Supreme Court has concluded, under the 1972 Amendments, "all longshoremen are to be treated the same whether their employer is an independent stevedore or a shipowner-stevedore and . . . all stevedores are to be treated the same whether they are independent or an arm of the shipowner itself." Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 266 (1979). While the Edmonds opinion focused on longshoremen, it is clear that Congress intended a general principle that the rights and liabilities of employee and employer should not turn on whether the employer acted in a dual-capacity as vessel owner. See, e.g., Smith v. Eastern Seaboard Pile Driving, Inc., 604 F.2d 789, 795 (2d Cir. 1979) (observing in context of nonstevedoring case that "the legislative history of the 1972 amendments makes it clear that the rights of an employee are not dependent on who the employer is").
 
 
 44
 It is not disputed that an employee of a dual-capacity employer-owner retains his right to sue the vessel for negligence under section 905(b). Even before the 1984 Amendments, the Supreme Court held unanimously in Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523 (1983), that a longshoreman, injured on a vessel during the course of his employment, could bring a section 905(b) negligence suit against the vessel, notwithstanding that the owner was also his employer, from whom he had already received statutory compensation pursuant to section 904. The Court found that the language of section 905(b) compelled this result. It reasoned that if section 905(a) had been intended to bar all employee suits against dual-capacity employers for third-party vessel negligence there would have been no need to insert the language expressly barring such actions where the injury was caused by the negligence of a fellow worker "'engaged in providing stevedoring services to the vessel.'" Jones & Laughlin, 462 U.S. at 530 (quoting 33 U.S.C. § 905(b)). By expressly delineating the circumstances in which a dual-capacity vessel may not be sued for its negligent injury to its covered employee, section 905(b) implies that the vessel may be sued for negligence by its covered employees in circumstances falling outside the specified exceptions. In further support of its holding, the Jones & Laughlin Court cited the unequivocal language of the 1972 Committee Report, quoted supra at 122-23, indicating that the rights and liabilities of employee and employer should not depend on whether the employee was employed directly by the vessel or by a stevedoring contractor. See Jones & Laughlin, 462 U.S. at 531-32 (quoting H.R. Rep. No. 92-1441, 1972 U.S.C.C.A.N. at 4705).
 
 
 45
 The Supreme Court's textual argument in Jones & Laughlin is even more compelling after the 1984 Amendments, which barred employees providing "shipbuilding, repairing, or breaking services" from bringing a negligence action against a dual-capacity employer-vessel owner in any circumstances. 33 U.S.C. § 905(b) (as amended by Pub. L. No. 98-426, § 5(a)(1), 98 Stat. 1639, 1641). As we concluded in a case heard after the 1984 Amendments, "[t]he 1984 change . . . shows that Congress knew how to preclude a class of employees from being able to sue an employer-vessel if it chose to do so." Guilles v. Sea-Land Serv., Inc., 12 F.3d 381, 386 (2d Cir. 1993); see also H.R. Rep. No 98-570(I), reprinted in 1984 U.S.C.C.A.N. 2734, 2741 ("The Committee intends that this language [in section 905(b)] not be construed to limit an employee's right to bring a cause of action, except in the circumstances indicated within the language.").
 
 
 46
 The Jones & Laughlin Court recognized, however, that section 905(b) "does make it clear that a vessel owner acting as its own stevedore is liable only for negligence in its 'owner' capacity, not for negligence in its 'stevedore' capacity." Jones & Laughlin, 462 U.S. at 531 n.6. While the last clause, excluding liability for negligence "in its 'stevedore' capacity," is dictum,[11] this conclusion is the logical result of the text and structure of the statute, and comports with the instruction of the legislative history. Insofar as the employer-vessel is negligent in its stevedore-employer capacity, it is immune from suit under section 905(a). However, insofar as it is negligent in its vessel capacity, it will be liable under section 905(b) in the same manner as a third party. This bifurcated approach gives effect to the express legislative intent that the rights and liabilities of employer, employee and vessel be affected as little as possible by the happenstance of whether the employee is employed by an independent contractor or by the owner of the ship.
 
 
 47
 2. A vessel's duties of care.
 
 
 48
 In Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156 (1981), the Supreme Court examined the issue of a vessel's duties of care under section 905(b) in the context of the classic triangular relationship among a vessel owner, an independent stevedoring contractor and an injured longshoreman employed by the stevedore. A longshoreman employed by an independent stevedoring contractor was injured when he was struck by cargo falling from a pallet. The pallet was suspended from a crane, which while undisputedly part of the vessel's gear, was operated by a fellow longshoreman also employed by the stevedore. It was alleged that the ship's crane had been malfunctioning for two days before the accident. At issue was (1) whether the cargo had fallen because the winch's braking mechanism had slipped due to the alleged malfunction; and (2) whether the vessel owner knew or should have known of the winch's faulty condition and had a duty to warn the stevedore and its employees of this hazardous condition. Finding no duty, the district court had entered summary judgment for the ship. The Court of Appeals vacated and remanded for trial. See Scindia, 451 U.S. at 159-64. The Supreme Court affirmed. See id. at 179. However, the Supreme Court disagreed with the court of appeals's conclusion that the vessel owner owed a continuing duty to inspect the vessel's gear, once the vessel had been turned over to the stevedore in safe condition. See id. at 451 U.S. at 163, 172. While noting the legal duties placed on the stevedore under section 41 of the LHWCA, 33 U.S.C. 941,[12] and the vessel's justifiable expectation that the stevedore will perform those duties, see Scindia, 451 U.S. at 176, the Supreme Court articulated three duties that defined the scope of the vessel's duty of care in the classic tripartite situation under section 905(b). These have become known as the "Scindia duties." E.g., 1 Thomas J. Schoenbaum, Admiralty and Maritime Law 442 (2d ed. 1994).
 
 
 49
 First, before turning over the ship or any portion of it to the stevedore, the vessel owner must exercise "ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety." Scindia, 451 U.S. at 167. As part of this duty, the vessel owner must also warn the stevedore of hidden dangers that could not be discovered through the exercise of reasonable care. See id. This set of obligations is usually referred to as the "turnover duty." Howlett v. Birkdale Shipping Co., 512 U.S. 92, 98 (1994).
 
 
 50
 Second, once stevedoring operations have begun, the vessel will be liable "if it actively involves itself in the cargo operations and negligently injures a longshoreman." Scindia, 451 U.S. at 167 (emphasis added). A passive vessel owner has no ongoing duty to supervise or inspect the stevedore's work-absent contractual, regulatory or customary obligations to the contrary. See id. at 172. However, even where the vessel does not actively involve itself in the stevedoring operations, it may be liable "if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." Id. at 167 (emphasis added). Therefore, the vessel must take care to prevent unreasonable hazards in areas of the vessel under its direct control. These related obligations arising either from the vessel's "active involvement" in cargo operations or its "active control" of areas of the vessel encountered by longshoremen are commonly known as the "active control duty." E.g., England v. Reinauer Transp. Cos., 194 F.3d 265, 270 (1st Cir. 1999); see also Howlett, 512 U.S. at 98.
 
 
 51
 Third, Scindia articulated an exception to the generally limited duties imposed on the vessel once operations have begun. With respect to obvious dangers in areas under the principal control of the stevedore, the vessel owner must intervene if it acquires actual knowledge that (1) a condition of the vessel or its equipment poses an unreasonable risk of harm and (2) the stevedore is not exercising reasonable care to protect its employees from that risk. See Scindia, 451 U.S. at 175-76. It was on this theory of liability that the plaintiff-longshoreman in Scindia may have been entitled to go to a jury. If the vessel knew of the dangerous condition of the winch and the "improvident" failure of the stevedore to protect its employees from that known hazard, the vessel was under a "duty to intervene." Id. at 175-77; Howlett, 512 U.S. at 98.
 
 
 52
 3. The application of Scindia to dual-capacity cases not involving stevedoring operations.
 
 
 53
 In Jones & Laughlin, the Supreme Court instructed that a covered employee may bring a section 905(b) action for negligence against a dual-capacity defendant in its vessel owner capacity; however, the Court has not yet explained how to distinguish between the employer responsibility and the vessel responsibility. See Morehead v. Atkinson-Kiewit, J/V, 97 F.3d 603, 605 (1st Cir. 1996) (en banc). Nor has the Court yet explained how the principles it set out in Scindia apply to claims brought by non-stevedoring harbor workers covered under the LHWCA against a vessel owned by their own employer. This case presents the question how to define a dual-capacity defendant's negligence in its role as vessel, so as to distinguish such actionable negligence from its non-actionable negligence in its role of construction contractor employing covered harbor workers.
 
 
 54
 As noted, Scindia defined the vessel's duty of care in the context of the traditional arrangement of stevedoring operations involving the triangular relationship of vessel, independent stevedore-employer, and longshoreman employee. See also Howlett, 512 U.S. at 96 (suggesting that this is the typical relationship in the longshoring business); Jones & Laughlin, 462 U.S. at 528 ("Most longshoremen who load and unload ships are employed by independent stevedores, who have contracted with the vessel owners to provide such services."). This case presents two variations from that fact pattern. First, Gravatt was a dock builder- a harbor worker covered under the LHWCA but not a longshoreman. Second, S&B was acting as a dual-capacity employer-vessel. The Supreme Court has not addressed the extent to which Scindia's analysis defines the vessel's duties to LHWCA-covered harbor workers not engaged in longshoring operations; nor has it ruled on how Scindia applies in dual-capacity cases. See Morehead, 97 F.3d at 611.
 
 
 55
 As to the first question, lower federal courts have generally held that Scindia provides the appropriate point of departure for analyzing a vessel's liability in a section 905(b) action brought by non-longshoring harbor workers. See, e.g., Morehead, 97 F.3d at 613 (applying Scindia in a case concerning a bridge construction worker); Elberg v. Mobil Oil Corp., 967 F.2d 1146, 1149-51 (7th Cir. 1992) (affirming district court's application of Scindia analysis to define scope of vessel duties to welder employed by ship repair company); Levene v. Pintail Enters., 943 F.2d 528, 533-36 (5th Cir. 1991) (applying Scindia analysis where harbor worker was heavy equipment operator who was injured on the deck of another owner's barge); Teply v. Mobil Oil Corp., 859 F.2d 375, 377 (5th Cir. 1988) (noting in principle that Scindia's analysis of scope of vessel liability under section 905(b) "applies to other harborworkers who work on board vessels as well" and applying analysis to worker employed by independent contractor who was injured on an oil well accessible only by barge); Cook v. Exxon Shipping Co., 762 F.2d 750, 752 (9th Cir. 1985) (holding that Scindia duties "apply to employees of independent repair companies who are working on a vessel"); Hill v. Texaco, Inc., 674 F.2d 447, 451 (5th Cir. 1982) (applying Scindia's analysis where plaintiff harbor worker was employee of repair contractor hired to inspect storage tanks of oil tanker for rust).
 
 
 56
 The more troublesome question, however, is how Scindia's instruction regarding the scope of the vessel's duties in the tripartite situation of employee, independent employer and third-party vessel is to apply to the dual-capacity case, where the LHWCA provides that the employer-vessel owner is immune from suit for negligent conduct in its "employer" capacity, see 33 U.S.C. § 905(a), but liable for suit under section 905(b) for negligence in its "owner capacity." Jones & Laughlin, 462 U.S. at 531 n.6.
 
 
 57
 The relationship seems clear as to the first prong of the Scindia duties-the "turnover duty." If because of negligence of the ship's crew, the vessel's equipment is faulty, or hidden dangers beset the contracted operation, so that an experienced contractor could not safely carry out its operations, such negligence would seem to constitute negligence in the capacity as vessel and render the ship liable whether the contracting operations were carried out by an independent stevedore or by the same entity as owns the vessel.[13]
 
 
 58
 The application of Scindia's second and third prongs-the active control duty and the duty to intervene upon actual knowledge-to the circumstance where the harbor-work contractor and the owner of the vessel are the same entity is more problematic. Where the contracted service is performed by employees of the entity that owns the vessel, by definition the vessel owner would have "actively involved" itself in the operation and would have "actual knowledge" of the failure of the personnel undertaking the task to operate in a manner that protected their coworkers from danger. Thus, if any "active control" or "actual knowledge" on the part of the dual-capacity defendant were sufficient to constitute actionable negligence under section 905(b)-regardless whether the defendant took control or had knowledge in its employer capacity or its vessel capacity-the availability of a tort remedy against the vessel would turn on whether the harbor-working operations were performed by a contractor independent of the vessel or by the same entity that owned the vessel-except in the four circumstances covered by the second and third sentences of section 905(b). Harbor-working employees not within these four specifically excluded categories would have more expansive tort remedies if employed by a dual-capacity employer-vessel owner than they would have if employed by an independent contractor. By the same token, the dual-capacity employer-vessel owner would have greater liabilities than if the work arrangement involved a single-capacity employer and a third-party vessel.[14]
 
 
 59
 This result would be contrary to the express intent of Congress, which sought generally in drafting section 905(b) to provide the same result regardless whether the covered work was performed by an independent contractor or by the ship through personnel it hired directly to perform it. See H.R. Rep. 92-1441, 1972 U.S.C.C.A.N. at 4705.
 
 
 60
 It therefore appears that the Scindia tests for vessel negligence, developed in the context of a tripartite relationship between employee, independent contractor and third-party vessel, cannot fully serve as the test for the negligence of a dual-capacity defendant in its vessel capacity without undermining the intent of Congress that the availability of a section 905(b) negligence action against the vessel should not depend on whether the vessel is owned by a third party or by the employer.
 
 
 61
 In Morehead v. Atkinson-Kiewit, J/V, 97 F.3d 603 (1st Cir. 1996), the First Circuit, sitting en banc, recognized that the liability of vessel owners would be greatly expanded in dual- capacity cases if the knowledge or active control of the dual-capacity defendant acting in its capacity as employer could be imputed to it in its capacity as vessel, thereby exposing it to liability under section 905(b) for breach of the second or third of the Scindia duties. See Morehead, 97 F.3d at 611. Following the analytical approach previously employed in the Fifth Circuit, Morehead ruled that the dual-capacity vessel could be held liable under section 905(b) only to the extent that it breached its Scindia duties of care while acting in its capacity as vessel. See id. at 613 (following Castorina v. Lykes Bros. S.S. Co., 758 F.2d 1025, 1033 (5th Cir. 1985) (holding that the LHWCA "requires us to separate the negligence of the shipowner and that of the stevedore, even when the shipowner performs its own stevedoring activities" and that "the duty owed by a shipowner to a longshoreman under section 905(b) is that established by Scindia . . . ; this duty is neither heightened nor diminished when the longshoreman is employed directly by the vessel")).
 
 
 62
 Morehead is particularly instructive for our case because the plaintiff, like Gravatt, was a harbor worker of a type not expressly mentioned in the second and third sentences of section 905(b). Morehead recognized that when the vessel owner is also the employer, failure to distinguish between its negligent conduct in its employer capacity, for which it is immune to suit in tort under section 905(a), and its negligence in its vessel capacity, for which it is liable to suit under section 905(b), has the effect of undermining the statutory scheme "by expanding the liability of employers that act simultaneously as vessel owners, when the statute does not call for such a reading and the Supreme Court has cautioned against it." Id. at 613. The Morehead court concluded that in determining whether the dual-capacity vessel-employer had breached its Scindia duties while acting in its vessel capacity, "a court may have to divide the employer-shipowner into a hypothetical independent employer and independent vessel owner, each separately holding the duties allocated under principles suggested in Scindia." Id.
 
 
 63
 Plaintiff Morehead was employed as a carpenter on a bridge construction project and a line-handler on a barge used in the construction project. See id. at 605. Defendant Atkinson-Kiewit ("A-K"), the construction contractor, was Morehead's employer, see 33 U.S.C. § 902(4), and, as the charterer of the barge, the vessel owner, see 33 U.S.C. § 902(21). Morehead was injured on the barge when he stepped into an open hatch. The hatch had been left open negligently by a co-worker, whose regular duties also included both carpentry and linehandling. See Morehead, 97 F.3d at 605. Under normal principles of respondeat superior the negligence of the co-worker would be imputed to A-K. The court framed the question as whether the negligent act of leaving the hatch open was attributable to A-K acting in its employer capacity, thereby precluding a tort remedy under section 905(a), or acting in its vessel capacity, thereby exposing it to liability in tort under section 905(b). See id. at 608. The plaintiff argued that A-K, acting in its vessel capacity, violated the Scindia duties it owed him because "at the time he was injured, A-K as vessel (rather than A-K as employer) . . . had 'active control' over or 'actual knowledge' of the open hatch." Id. at 614.
 
 
 64
 The First Circuit rejected the argument. It found that Morehead's co-worker, in opening the hatch, was acting as an agent of his employer not as an agent of the vessel, because the hatch was opened in furtherance of A-K's operations as a bridge builder, rather than in its capacity as vessel owner. Id. at 616. It concluded that the barge tended by Morehead and his co-worker were "operated within A-K's control and knowledge qua employer." Id. at 614. The barge was "analogized to the areas of a vessel taken over by longshore workers in the Scindia setting." Id. Morehead's co-worker was found to have acted "as Morehead's fellow employee pursuing assigned harbor-worker duties rather than as A-K's agent in its distinct shipowner's capacity." Id. at 616. Any negligence imputed to A-K was therefore attributable to its capacity as employer, for which it was immune from liability in tort under section 905(a).
 
 
 65
 We agree with that analysis of the application of Scindia duties to the dual-capacity employer. Liability in vessel negligence under section 905(b) will only lie where the dual-capacity defendant breached its duties of care while acting in its capacity as vessel owner.[15] The negligent actions of a dual-capacity defendant's employees must be analyzed to determine whether they were undertaken in pursuance of the defendant's role as vessel owner or as employer. The negligence of the employer's agents, acting in tasks constituting harbor-work employment, may not be imputed to their employer in its capacity as vessel owner. Congress's intention is best carried out through analysis of the dual-capacity defendant's allegedly negligent conduct to determine whether it constituted negligence of the defendant in its role as vessel owner, rather than within the scope of its harbor-working activities. If the negligent conduct occurred in the course of activity within the scope of the covered harbor work-such that if a contractor independent of the vessel were performing the work, its liability would have been limited under section 905(a) to statutory compensation payments-then liability should not lie against the vessel under section 905(b) simply because the defendant was both employer and vessel owner.
 
 
 66
 The approach adopted by the First and the Fifth Circuit comports with our own cases in which we have consistently recognized that Congress did not intend the rights of employees and the liabilities of employers and vessels under the LHWCA to turn on whether the injured employee was employed by an entity acting in the dual capacity of employer and vessel owner. See, e.g., Napoli v. Hellenic Lines, Ltd., 536 F.2d 505, 507 (2d Cir. 1976) ("The expressed intent of Congress was that the same principles should apply in determining the liability of a vessel which employs its own longshoremen as apply when they are the servants of an independent contractor."). As a corollary, in dual-capacity cases "in order to determine whether a shipowner-employer may be held liable for damages, a court must decide if the negligence that caused the accident was owner occasioned," and "the key issue is whether the shipowner's employees who were at fault committed the negligent acts in their capacity as agents of the vessel on the one hand or as employees performing longshoring, shipbuilding or repair services on the other." Smith v. Eastern Seaboard Pile Driving, Inc., 604 F.2d 789, 795 (2d Cir. 1979) (internal quotation marks omitted).
 
 
 67
 In summary, when the employer of an injured harbor worker is also the owner of the vessel and is sued by the harbor worker for negligence under section 905(b) for vessel negligence, the court's task is to analyze the allegedly negligent conduct to determine whether that conduct was performed in the course of the operation of the owner's vessel as a vessel or whether the conduct was performed in furtherance of the employer's harbor-working operations.
 
 
 68
 4. The application of the test to S&B's negligence.
 
 
 69
 The application of this test to the present facts leads to the conclusion that S&B was negligent in its capacity as employer, not in its capacity as vessel. Neither the materials barge, nor the crane barge, nor anybody present at the bridge repair site was engaged in vessel duties at the time of the accident.
 
 
 70
 The task of the materials barge, as a vessel, was to transport building materials from Newark to the work site and to transport debris from the work site to Newark. On the other hand, the task assigned to the negligent Holzheuer and the harbor-working gang of which Gravatt was a part was to make repairs to the 145th Street Bridge, which included the unloading of construction materials brought by the barges and the reloading of the barges with debris. The performance of the construction work was separate and apart from the vessel's work. Gravatt's injury occurred by reason of Holzheuer's negligent conduct within the scope of Holzheuer's employment as a supervisory harbor worker overseeing materials handling in making repairs to the bridge-not in the performance of vessel-related duties. Holzheuer was negligent as agent of S&B in its capacity as contractor performing bridge repairs not in its capacity as vessel owner. Had the bridge repairs been performed by a contractor independent of the vessel, Gravatt, the injured employee, and Holzheuer, the negligent employee, would both have been employees of the construction contractor, not of the barge used to transport materials to the construction site. In such circumstances it would have been clear that Gravatt's recovery was limited by section 905(a) to his compensation remedy against his employer. He would have had no basis for asserting negligence on the part of the barge owner, who would have delivered the barge loaded with materials to the construction site and been waiting to tow it back to Newark once it was loaded with debris. The fact that Gravatt's injury, resulting from the negligence of his supervisor Holzheuer, took place on a barge owned by their employer, does not justify imposing negligence liability on S&B as owner of the barge, as a third party. Because S&B's negligence was attributable to its capacity as employer rather than its capacity as vessel, its exclusive liability to its injured employee is for the statutory compensation payments under section 904. See 33 U.S.C. § 905(a). There was no negligence of anyone acting in a vessel capacity to justify a tort action against the vessel as third party under section 905(b).
 
 
 71
 As for the crane barge, for a long time it had been tied up at the bridge, dedicated to the harbor-working project of bridge repair. The crane barge was deployed directly in the construction activity-to drive new piles, to extract old piles and to excavate the river bed; it was also used to handle materials in support of that construction activity. All the personnel working on the crane barge were engaged in bridge repair; none was engaged in seafaring work. At the time of the accident, the specific task of the crane barge, whose negligent performance led to Gravatt's injury, was the stevedoring of the materials barge. Stevedoring work is treated by section 905(b) as not a part of vessel duties. Employees injured while employed by a vessel to provide stevedoring services are expressly barred from bringing a suit for negligence against the vessel under section 905(b), when their injury was caused by the negligence of other persons engaged in providing stevedoring activities. See 33 U.S.C. § 905(b).
 
 
 72
 It may be viewed as an unhappy result to limit a worker seriously injured by the negligence of an agent of his employer to his statutory compensation payments. But that is the intent of workers' compensation laws and it is the result intended by Congress under the LHWCA. The employer's immunity from liability in tort for its negligence is the rule established by section 905(a), while an employee's ability to recover from the vessel under section 905(b) is the exception. See Canizzo v. Farrell Lines, Inc., 579 F.2d 682, 687 (2d Cir. 1978) (Friendly, J., dissenting) ("Courts must be exceedingly careful in defining the contours of the [covered employee's] action for negligence against the ship . . . lest too expansive notions of the ship's duty vitiate Congress' intent to do away with absolute liability for vessels . . . and make greatly improved compensation benefits the primary remedy for longshoremen and harbor workers."); Morehead, 97 F.3d at 613; Levene v. Pintail Enters., 943 F.2d 528, 531 (5th Cir. 1991) ("The availability of a tort remedy for vessel negligence is a limited exception to the . . . LHWCA, which . . . generally replaces negligence causes of action against employers with a system of predetermined, standardized benefits.") (footnote omitted). Congress adopted this position in part because it believed that the best way to protect harbor workers from injury was to place no-fault responsibility for compensation on their employers. To place tort liability on the vessel merely because it is owned by the same entity as employed the covered workers would be contrary to the scheme Congress developed.
 
 
 73
 (5) The district court's reasoning.
 
 
 74
 The district court imposed liability on S&B on the basis of separate, alternative lines of reasoning. It read Fanetti, 678 F.2d 424, to mean that in a dual-capacity case "the owner-employer is liable to the worker for injuries caused by the owner-employer's negligence . . . [regardless] whether the acts of negligence are attributable to the owner-employer in its capacity as owner or as employer." Gravatt, 53 F. Supp. 2d at 424. Alternatively, the district court ruled that "[e]ven under Morehead, S&B as vessel owner" breached its Scindia duties, Gravatt, 53 F. Supp. 2d at 421 (emphasis added); and relying on a passage from Smith v. Eastern Seaboard Pile Driving, Inc., 604 F.2d 789 (2d Cir. 1979), it concluded that "Gravatt is entitled to recover against S&B because the injuries were caused by S&B in its capacity as vessel owner." Gravatt, 53 F. Supp. 2d at 423 (emphasis added). We believe the court misinterpreted the authorities on which it relied.
 
 
 75
 The district court recognized that Morehead's analysis requires the court to distinguish a dual-capacity defendant's conduct in its employer capacity from its conduct in its vessel capacity, and that in undertaking this analysis the "'court may have to divide the employer-shipowner into a hypothetical independent employer and independent vessel owner, each separately holding the duties allocated under principles suggested in Scindia.'" Gravatt, 53 F. Supp. 2d at 421 (quoting Morehead, 97 F.3d at 613).[16] Applying this mode of analysis, the district concluded that:
 
 
 76
 S&B as vessel owner had active control over the vessel and its cargo of debris and new material, and knew or should have known[17] about the hazards created when commingling debris and new material and the potential for injury-causing accidents to occur, making it liable under Scindia standards. S&B did not exercise ordinary care in keeping its debris/material barge, crane barge, and vessel equipment in a condition that would permit its workers, who were not expert and experienced stevedores, to carry on cargo operations safely. . . . S&B failed to fulfill its Scindia duty to intervene and correct the hazardous condition created by commingling the debris and good materials on its barges and the use of timber tongs. Morehead also holds that the Scindia duty arising from active control over a hazardous condition is triggered when the dangerous condition is on the vessel itself.
 
 
 77
 Id. at 421-22 (citations omitted).
 
 
 78
 In our view the district court's observations justify the conclusion that S&B was negligent, but not that it was negligent in its capacity as vessel owner. A-K, the vessel owner in Morehead, also had been negligent in circumstances where its agents exercised active control of the barge and had actual knowledge of the hazard. Nonetheless it was not held liable under section 905(b) because its negligence was in its capacity as the employer of construction workers, rather than in its capacity as vessel owner. See Morehead, 97 F.3d at 614, 616. Although the dangerous condition arose on A-K's vessel through the negligence of A-K's employee, it was caused by the negligence of a worker acting within the scope of his employment as a harbor worker who had been employed by the dual-capacity defendant in its capacity as construction contractor. In its role as vessel owner, A-K had turned the vessel over to the care of its harbor workers assigned to the construction project.
 
 
 79
 The same is true of this case. Gravatt and his foreman Holzheuer were hired by S&B in its capacity as construction contractor to make repairs to the bridge's fender system. S&B also chartered barges. S&B's crane barge had been turned over to S&B's harbor construction workers: it was used either directly in construction activities-extracting old piles, driving new piles and excavating the river bed-or in the materials handling operations. S&B's materials barge, having transported construction materials from Newark to the bridge site, was turned over to S&B's construction employees to have the new materials offloaded and the debris materials loaded on. In performing this materials handling operation, these employees acted negligently, but this negligence arose from operational decisions made by S&B in its capacity as construction contractor not in its capacity as vessel owner. While S&B had "active control" over the barge, and "actual knowledge" of the negligent conduct, those facts are not sufficient to render it liable, unless that active control or actual knowledge was in its role as vessel owner.[18]
 
 
 80
 In further support of its conclusion that Gravatt's injuries "were caused by S&B in its capacity as vessel owner," Gravatt, 53 F.Supp. 2d at 423, the court also cited our opinion in Smith, 604 F.2d 789, and quoted language from that opinion which stressed that the "'acts and omissions found to constitute actionable negligence all took place prior to the actual dive'" in which the covered worker drowned. Gravatt, 53 F. Supp. 2d at 424 (quoting Smith, 604 F.2d at 796). The district court reasoned that "S&B's negligence [also] preexisted the date of the injury," id., because the evidence showed that S&B's negligent work practices-the mixing of debris and new material on the materials barges and the use of timber tongs as hoisting equipment-"were consistent practices adopted prior to the accident." Id.
 
 
 81
 We do not agree with this understanding of Smith. In Smith, decided before Scindia, Fanetti and the 1984 Amendments, we recognized that in dual-capacity cases "in order to determine whether a shipowner-employer may be held liable for damages, a court must decide if the negligence that caused the accident was owner occasioned." Id. at 795 (internal quotation marks omitted). Therefore, "the key issue [was] whether the shipowner's employees who were at fault committed the negligent acts in their capacity as agents of the vessel on the one hand or as employees performing longshoring, shipbuilding, or repair services on the other." Id. Our approach in Smith, therefore, is consistent with the bifurcated analysis of the conduct of a dual-capacity defendant adopted by the First Circuit in Morehead and the Fifth Circuit in Castorina. The key question is, in what capacity was the defendant negligent?
 
 
 82
 In Smith, plaintiff's deceased husband was employed by defendant as a diver to inspect underwater damage to a dredge, owned by the defendant. He worked off a tug which was also owned by the defendant. When he jumped into the water, the heavy equipment he wore overturned him, putting him in distress. The efforts of the tug personnel to right him, buoy him and haul him from the water were unsuccessful and he drowned. The jury at trial determined that the defendant was negligent by reason of the tug's failure to have (i) an emergency plan, (ii) a rescue line, life ring or life raft, and (iii) a ladder to facilitate reboarding. The district court, however, entered judgment for the defendant because it held that the negligence was that of tug employees who, like the decedent, were involved in the provision of repair services. See Smith, 604 F.2d at 792-93.
 
 
 83
 We reversed, directing the entry of judgment for the plaintiff. See id. at 798. Plaintiff argued to us that defendant's "negligence as shipowner rather than the negligence of its employees acting as repairmen caused the drowning." Id. at 793. We agreed. We observed that in ruling for the defendant, the district court did not undertake
 
 
 84
 sufficient scrutiny of the particular negligent acts that were found to have been committed. The acts and omissions found to constitute actionable negligence all took place prior to the actual dive and were akin to a failure to provide a safe place to work. The absence of a rescue plan, the improper placement of emergency apparatus, and the failure to provide a ladder or platform were all defects in the general operation of the tug, and it is merely fortuitous that they came to light during a dive that was part of a repair program.
 
 
 85
 Id. at 796 (footnotes omitted).
 
 
 86
 The negligence was found to be in the vessel capacity because it consisted of the failure to equip the tug properly for emergencies. That the negligent acts occurred prior to the accident, the fact upon which the district court in our case focused, was not the crucial point in Smith; it was merely a facet of the overall conclusion that the negligence was in the role of vessel and not in the role of employer performing the task for which the plaintiff was hired.
 
 
 87
 As we have seen, that bifurcated analysis leads to an opposite conclusion in this case. It may be that the patterns of negligent conduct-the loading of debris so as to obstruct access to new materials and the use of tongs-had been established prior to the accident that resulted in the injury. But those negligent work practices were undertaken as part of the materials handling process in performance of the bridge repairs for which plaintiff was hired. They were not, as was the case in Smith, a part of the "operation of the [vessel]." Accordingly, the record of consistently negligent work practices establishes only that S&B was a consistently negligent employer that routinely failed to provide a safe place to work. And Gravatt's remedy against S&B in its capacity as his employer is limited to the statutory compensation payments under section 904. See 33 U.S.C. § 905(a). The record proves only negligence in S&B's role as the employer of Gravatt and his crew, not in S&B's role as vessel owner.[19]
 
 
 88
 As noted, the district court's second basis for imposing liability was its reading of Fanetti, 678 F.2d 424. In response to S&B's argument that it was negligent in its role as employer, not in its role as vessel owner, the court explained,
 
 
 89
 [i]n Fanetti, the Second Circuit answered the question of whether a shipowner choosing to act as its own stevedore is entitled to insulation from liability, partial or total, which hiring an independent stevedore might otherwise afford. The Second Circuit answered that question in the negative, affirmed a verdict in favor of the plaintiff, and held that a shipowner choosing to act as its own stevedore is not entitled to insulation from liability under the LHWCA. S&B as vessel owner in this case, acted as its own [contractor], and any negligence on its part is actionable vessel owner negligence under § 905(b).
 
 
 90
 Gravatt, 53 F. Supp. 2d at 420-21 (emphasis added). The district court concluded that:
 
 
 91
 Under Fanetti, . . . when an owner-employer does not use an independent stevedoring contractor to load, unload, or restow cargo, the owner-employer is liable to the worker for injuries caused by the owner-employer's negligence. There is no need to determine whether the acts of negligence are attributable to the owner-employer in its capacity as owner or as employer.
 
 
 92
 Id. at 424 (emphasis added).
 
 
 93
 This conclusion is contrary to the Supreme Court's observation in Jones v. Laughlin that "a vessel owner acting as its own stevedore is liable only for negligence in its 'owner' capacity, not for negligence in its 'stevedore' capacity." Jones v. Laughlin, 462 U.S. at 531 n.6. It conflicts with Congress's express intent, and the logic and language of the LHWCA, that the worker's entitlement to a tort remedy should not depend on whether he was employed directly by the vessel or by an independent contractor. See id. at 532; Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 266 (1979). Finally, it conflicts with our own previous case law which recognizes this intent. See Napoli, 536 F.2d at 507; Smith, 604 F.2d at 795; Albergo v. Hellenic Inc., 658 F.2d 66, 68-69 (2d Cir. 1981).
 
 
 94
 We believe the district court read the pertinent passage from Fanetti out of context. Pasquale Fanetti worked as a longshoreman loading containers on board the Hellenic Splendor. Hellenic Lines Ltd. ("Hellenic"), the owner of the vessel, made a practice of hiring its own longshoremen, rather than engaging a stevedoring contractor. Thus Hellenic stood in a dual capacity with respect to Fanetti, acting both as his employer and as the vessel on which he worked. Fanetti was injured when he slipped and fell by reason of greased and oily lashing gear, which the vessel's crew negligently had left obstructing a walkway. The vessel's crew was responsible for lashing down the cargo containers after they had been loaded by the longshoremen. The crew had left the lashing gear on the deck in preparation for that task. Both Fanetti and his hatch boss on the stevedoring crew had complained to the vessel's crew about the obstruction to the walkway, but to no avail. See id. at 426.
 
 
 95
 Not surprisingly, the jury found that Fanetti was injured as the result of negligence on the part of the vessel, and the district court entered judgment against Hellenic. It was clear that "[c]rew negligence created the hazard." Id. at 427. The negligence had been in the dual-capacity employer's role as vessel owner. On appeal, Hellenic did not dispute that proposition. See id. at 426 ("We do not understand Hellenic to dispute on the appeal that the vessel's crew, in the performance of work unrelated to the longshoremen's loading of cargo, created a condition on deck dangerous to the longshoremen who had to work there."). Rather Hellenic contended that notwithstanding that the dangerous condition arose from the negligent conduct of its vessel's crew, the jury should have been instructed that the "stevedore bears the primary responsibility to correct dangerous conditions" and that liability under section 905(b) lies against the vessel only if the vessel could reasonably anticipate that the stevedore would not correct the hazard. Id. at 427. Hellenic argued that the jury should have been instructed on the distinction between the safety responsibilities of the shipowner and the stevedore; in particular Hellenic complained that the jury was not instructed that the stevedore was responsible for insuring compliance with health and safety regulations relating to longshoring. Id. at 427.
 
 
 96
 We disagreed and affirmed the district court. We noted that even if the jury had been instructed in the manner that Hellenic requested, "exoneration of Hellenic on the evidence in this case [was] unlikely." Id. However, we declined to affirm on the basis that any error in the charge was harmless. We noted that in Doca v. Marina Mercante Nicaraguense, S.A., 634 F.2d 30 (2d Cir. 1980), this court had imposed a 10% share of responsibility on a stevedore, which had failed to discharge a non-delegable duty imposed by an OSHA regulation requiring it to keep its work area free of tripping hazards, notwithstanding "'[t]he fact that the hazard was primarily the ship's responsibility.'" Fanetti, 678 F.2d at 427-28 (quoting Doca, 634 F.2d at 33). Because we were "not prepared to say that no reasonable jury could find that the obstruction was at a place where an independent [stevedore] contractor (if one existed) would have been expected to remove it," we therefore reached the question "whether a shipowner choosing to act as its own stevedore is entitled to that insulation from liability, partial or total, which hiring an independent contractor might have afforded." Id. at 428
 
 
 97
 We answered the question "in the negative," citing the language of Judge Van Graafeiland in Napoli, 536 F.2d at 508, and of Judge Friendly in a dissenting opinion in Canizzo v. Farrell Lines, 579 F.2d 682, 689 (2d Cir. 1978), to the effect that to relieve a shipowner of liability for a dangerous condition it had created because that hazard was known to the stevedore was clearly inappropriate where the shipowner acts as its own stevedore. See Fanetti, 678 F.2d at 428.
 
 
 98
 While it is true we concluded in Fanetti that "a shipowner choosing to act as its own stevedore is [not] entitled to that insulation from liability, partial or total, which hiring an independent contractor might have afforded," id. at 428, the district court read far too much into the statement.[20] See Gravatt, 53 F. Supp. 2d at 424 ( "There is no need to determine whether the acts of negligence are . . . in its capacity as owner or as employer."). Fanetti did not mean that when a vessel hires its own personnel to perform harbor work, rather than bringing in an independent contractor, it is liable to the workers in tort for all injuries caused by the negligence of its employees, regardless whether the negligent conduct occurred while the defendant was operating in the capacity of vessel or of employer.
 
 
 99
 It was undisputed that Hellenic's negligent acts in Fanetti were committed in its role as vessel by the vessel's permanent crew. Had the negligent obstruction of the walkway resulted from the carelessness of the stevedoring gang, which Hellenic had hired directly rather than retaining a stevedoring contractor, Fanetti does not suggest that the vessel would have been liable in tort under section 905(b). Such a result would make the vessel's liability turn on whether the shipowner hired a stevedoring contractor or directly hired the longshoring crew-the very result Congress sought to avoid. See H.R. Rep. 92-1441, 1972 U.S.C.C.A.N. at 4705; see also Jones & Laughlin, 462 U.S. at 532 ("'[A]ll longshoremen are to be treated the same whether their employer is an independent stevedore or a shipowner-stevedore . . . .'") (quoting Edmonds, 443 U.S. at 266); Napoli, 536 F.2d at 507 ("The expressed intent of Congress was that the same principles should apply in determining the liability of a vessel which employs its own longshoremen as apply when they are the servants of an independent contractor.").
 
 
 100
 What we meant in Fanetti was that a shipowner that has incurred liability in its vessel capacity by the negligent acts of its vessel's crew cannot escape any part of that liability by pointing to the failure of its own stevedoring employees to correct the hazard. A dual-capacity defendant, negligent in its vessel capacity, cannot escape liability under section 905(b) by asserting that it should have removed the hazard in its stevedoring capacity.[21] In this case, however, the threshold question is whether S&B was negligent in its vessel capacity.
 
 
 101
 If the dual-capacity defendant acts negligently as an employer, its exclusive liability under LHWCA is for compensation, just as if it were an independent contractor. If its negligence is in its vessel capacity, it is liable to its employee in tort under section 905(b), to the same extent as a third-party vessel would be liable to the injured employee of an independent employer injured as the result of the third-party vessel's negligence, and the vessel does not escape liability on the theory that its employees acting in furtherance of its employer capacity ought to have prevented the injury.
 
 
 102
 Because S&B's negligence which caused Gravatt's injury was committed only in its role as his employer in the bridge repairs, and not in its role as owner of the barge on which he was injured, S&B's liability is limited by the LHWCA to compensation. The judgment against it must be vacated. It is, therefore, not necessary to reach the other arguments raised.
 
 CONCLUSION
 
 103
 The judgment against S&B is reversed.
 
 
 
 Notes:
 
 
 [1]
 Because we conclude that S&B was not liable in negligence under section 905(b) and reverse the judgment, we need not reach the other arguments S&B raised on appeal regarding: (1) S&B's entitlement to a judgment credit to reflect the payments the Gravatts received in their post-judgment settlement with codefendants the City of New York and N. Massand, P.C.; (2) whether punitive damages may be awarded in suits brought under section 905(b); and (3) whether Gravatt was contributorily negligent.
 
 
 [2]
 For this reason the district court correctly dismissed Gravatt's claims under the Jones Act, concluding that Gravatt had an insufficiently substantial connection to a vessel in navigation to qualify as a seaman under the standard set out in Chandris, Inc. v. Latsis, 515 U.S. 347 (1995). See Gravatt v. City of New York, 1998 WL 341941, at *5-*6 (S.D.N.Y. June 26, 1998).
 
 
 [3]
 The district court concluded that this "use of timber tongs . . . violated an industry-wide safety standard. It also violated § 1981.81 of OSHA, 29 CFR § 1981.81, as well as [New York State] Industrial Code §§ 23-1.5(c)(2), 23-2.1, 23-3.3(k), 23-6.1(d), 23-6.1(e), 23-8.1(e)(3), 23-8.1(f)(1)(iv), 23-8.1(f)(2)(ii), and 23-8.2(c)(3)." Gravatt, 53 F. Supp. 2d at 417.
 
 
 [4]
 It has been undisputed throughout that S&B's conduct was negligent. See, e.g., Gravatt, 1998 WL 171491, at *10 n.2 ("The [hoisting] procedure adopted was unsafe and recognized to be so.").
 
 
 [5]
 In turn, section 907 sets out in detail the employer's obligations to provide certain medical services and supplies "for such period as the nature of the injury or the process of recovery may require." 33 U.S.C. § 907(a). Section 908 sets out a detailed schedule of payments that the employer must make in the case of permanent total, temporary total or permanent partial disability. See id. § 908. Section 909 sets out a schedule of death benefits and specifies the beneficiaries to whom they are payable in the event that an employee's injury is fatal. See id. § 909
 
 
 [6]
 "The term 'employee' means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor worker including a ship repairman, shipbuilder, and ship breaker . . . ." 33 U.S.C. § 902(3). The term does not include certain employees "subject to coverage under a State workers' compensation law," id. § 902(3), including "master[s] or member[s] of a crew of any vessel." Id. § 902(3)(G).
 
 
 [7]
 "The term 'employer' means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel)." 33 U.S.C. § 902(4).
 
 
 [8]
 "[T]he term 'vessel' means any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member." 33 U.S.C. § 902(21).
 
 
 [9]
 Longshoremen thus came to be described as "Sieracki-seamen."
 
 
 [10]
 Lastly, by 1972, the incentive to sue the vessel for unseaworthiness, and thereby impose this liability indirectly on the stevedore, was especially great because the maximum compensation available under the LHWCA had not been increased for 12 years. As a result many workers received statutory disability benefits under the LHWCA "as low as 30% of their average weekly wage." H.R. Rep. 92-1441, 1972 U.S.C.C.A.N. at 4700.
 
 
 [11]
 Plaintiff Pfeifer, a longshoreman, slipped and fell on a barge owned by his employer, which had "negligently failed to remove [snow and ice] from the gunnels." Jones & Laughlin, 462 U.S. at 526. The only issue of liability before the Supreme Court was whether Pfeifer's suit was precluded by the exclusive liability language of section 905(a). The defendant did not contest that its negligence was attributable to it in its capacity as vessel owner.
 
 
 [12]
 Section 941(a) requires that "[e]very employer shall furnish and maintain employment and places of employment which shall be reasonably safe for his employees in all employments covered by this chapter" and authorizes the Secretary of Labor to determine by regulation particular "devices . . . safeguards . . . and working conditions." 33 U.S.C. § 941(a).
 
 
 [13]
 We use the example of stevedoring operations to illustrate the issues involved in applying Scindia's analysis to the dual-capacity employer-vessel owner. The vessel-stevedore-longshoreman relationship is intended only as a concrete example of any vessel-employer-employee relationship that may arise under the LHWCA's definition of those terms. See 11 U.S.C. § 902(3), (4), (21); cf. Canizzo v. Farrell Lines, Inc., 579 F.2d 682, 687 n.1 (2d Cir. 1978) (Friendly, J., dissenting). In our case, the relationship is between vessel (S&B qua vessel), construction contractor (S&B qua employer) and dock builder (Gravatt). The question of how Scindia applies outside the context of stevedoring operations is analytically distinct from the question of how it applies outside the triangular relationship of parties.
 
 
 [14]
 This can be seen by simple example. Suppose covered workers are performing harbor work that is not within the express statutory exclusions, and that the work involves the use of a vessel. One of the workers is injured as the result of another's negligent performance of the work. If those workers were employed by a contractor independent of the vessel, the injured worker is limited to compensation; he has no negligence action against the vessel. If on the other hand, the function is performed by the same entity that owns the vessel, then by definition the vessel's employees will have directly involved themselves in the activities and will have actual knowledge of the unsafe practices being used by the personnel performing the task. Liability of the vessel in tort would follow.
 
 
 [15]
 We also agree with Morehead that Scindia may be an appropriate starting point for determining the scope of those duties, but recognize that certain harbor-work arrangements "may be so foreign to those in Scindia's stevedoring context that Scindia's analysis [regarding the scope of those duties] will become no more than a point of departure." Id. at 613. The central question in each case will be whether the negligence of a dual-capacity defendant is attributable to its capacity as vessel owner or its capacity as employer.
 
 
 [16]
 The district court went on to quote, with added emphasis, Morehead's observation that "'[o]n occasion, however, the duties and work arrangements pertaining to a suing harbor worker may be so foreign to those in Scindia's stevedoring context that Scindia's analysis will become no more than a point of departure.'" Gravatt, 53 F. Supp. 2d at 421 (quoting Morehead, 97 F.3d at 613 (emphasis added in Gravatt)). We think the district court misread the significance of Morehead's caution that Scindia will sometimes provide only a starting point for defining the scope of a vessel's duties of care. That caution does not abrogate the need to distinguish in dual-capacity cases between defendant's negligence qua vessel and its negligence qua employer. As we recognized as early as Smith, that distinction is always the "key issue" in dual-capacity cases. Smith, 604 F.2d at 795. Morehead cautions only that in defining the vessel's duties of care qua vessel in a non-stevedoring case, Scindia's instruction may sometimes not be that pertinent. It provides no support for the conclusion that "[t]here is no need to determine whether the acts of negligence are attributable to the owner-employer in its capacity as owner or as employer." Gravatt, 53 F. Supp. 2d at 424.
 
 
 [17]
 Even under Scindia's duty to intervene, "should-have-known" constructive knowledge is insufficient to meet the actual knowledge requirement. See 1 Thomas J. Schoenbaum, Admiralty and Maritime Law 447 & n.74 (2d ed. 1994).
 
 
 [18]
 As we have noted, in a nonstevedoring case involving harbor work, Scindia's delimitation of the scope of the duties of care owed by the vessel may only provide a starting point for the analysis of whether the vessel was negligent. See supra note 15. Even applying Scindia's tests mechanically, we conclude no agent of S&B in its vessel capacity "actively involve[d]" itself in the material handling operations. Scindia, 451 U.S. at 167. And there were no areas of the barge that remained outside the control of the construction workers and therefore under "the active control of the vessel." Id. The district court's assertion that "Morehead . . . holds that the Scindia duty arising from active control over a hazardous condition is triggered when the dangerous condition is on the vessel itself," Gravatt, 53 F. Supp. 2d at 422, misreads Morehead's holding and reasoning. No liability was found in Morehead, notwithstanding that the hazardous condition (the open hatch) was "on the vessel itself," because the hazard arose while the barge was not in the active control of the dual-capacity employer acting in its capacity as vessel owner. That the hazard was "on the vessel" is insufficient ground to impose liability.
 
 
 [19]
 In this respect, there is a somewhat confusing observation in the Smith opinion. After explaining that the negligent acts justifying the vessel's liability were defects in the general operation of the tug and not a part of the repair program, the court observed that "Eastern [the employer and owner of both the tug and the damaged dredge] might have escaped liability if it had surrendered control over the operation to a subcontractor that could supply and supervise its own divers." Smith, 604 F. 2d at 796. That observation might seem to contemplate that a different result would obtain depending whether an independent contractor were employed. But if Eastern had employed an independent contractor for the dive, nonetheless using its own tug to bring the diver to the repair site, and the accident had happened in the same fashion, Eastern would have remained liable for its negligence as third party under the first sentence of 905(b) because the negligence giving rise to the liability was premised not on how the diving operation was performed but rather on Eastern's failure as tug owner to equip its tug with a proper rescue plan and rescue equipment. What the court must have contemplated in the sentence was that Eastern might not only have hired an independent contractor to provide the diver but also relied on that independent contractor to supply the tug that brought the diver to the site. In those circumstances, it is true Eastern would have escaped liability-because there would have been no negligence whatsoever on Eastern's part. Nonetheless the result would have been similar in that the tug owner would have incurred liability for furnishing a negligently equipped tug. From the point of view of the vessel and the plaintiff, the result would have been the same. The only change would have been in the identity of the owner of the vessel held liable to the plaintiff.
 
 
 [20]
 We recognize that the district court was not alone in reading Fanetti to establish that a dual-capacity defendant will be liable in negligence under section 905(b) regardless whether its negligent conduct was in its capacity as the employer of harbor workers covered under the LHWCA or in its capacity as vessel. See, e.g., Morehead, 97 F.3d at 611 (hypothesizing that we would no longer endorse Fanetti in the light of the Supreme Court's decision in Jones & Laughlin); Sutherland v. City of New York, 699 N.Y.S.2d 426, 431 (2d Dep't 1999) (adopting the First and Fifth Circuits' analysis as "consistent with Congressional intent and the limitations on employer liability set forth in the LHWCA" and suggesting we would no longer endorse Fanetti); Frazor T. Edmondson, Toward a Vessel Owner's Interpretation of Dual Capacity: Why Fanetti Should be Deemed Implicitly Overruled, 18 Del. J. Corp. L. 477 (1993). We agree that such a reading of Fanetti endorses a result that conflicts with the intentions expressed in the House Committee Report, with the Supreme Court's admonition that "all longshoremen are to be treated the same whether their employer is an independent stevedore or a shipowner-stevedore," Edmonds, 443 U.S. at 266; accord Jones & Laughlin, 462 U.S. at 532, and with our own case precedents, see Napoli, 536 F.2d at 507; Smith, 604 F.2d at 795; Albergo, 658 F.2d at 68-69. We respectfully believe that the district court and the cited commentators have read more into Fanetti than we intended.
 
 
 [21]
 We note a further reason why the Fanetti discussion cannot justify the result reached by the district court. When Fanetti entertained the question whether a shipowner acting as its own stevedore is entitled to "that insulation from liability, . . . which hiring an independent contractor might have afforded," it was considering a speculative possibility. Fanetti, 678 F.2d at 428 (emphasis added). But the supposition entertained by Fanetti that a shipowner that had negligently created a dangerous condition in its vessel capacity could diminish its liability simply by hiring an independent stevedore is contrary to fact. As the Supreme Court made clear in Edmonds, in the classic triangular situation in which the covered worker is employed by an independent contractor, if the worker's injury is caused by negligence on the part of both the vessel and the worker's independent employer, the employer will be shielded from liability in tort by the exclusivity of the compensation remedy and the vessel will be liable for the full extent of the harm. See Edmonds, 443 U.S. at 264 ("[T]he longshoreman may recover the total amount of his damages from the vessel if the latter's negligence is a contributing cause of his injury, even if the [employer] stevedore, whose limited liability [compensation] is fixed by statute, is partly to blame.").
 The Fanetti court contemplated that the vessel's employment of an independent contractor might diminish its liability because, in Doca, a ten percent allocation of liability had been placed on the independent stevedore by reason of its failure to clear up the hazard negligently created by the vessel. But Doca did not involve the relationship between ship and independent stevedore as employer. See Doca, 634 F.2d at 32. In Doca, the injured harbor worker was employed by a subcontractor which in turn had been retained by the independent stevedore. In their relation to the injured worker, both the stevedore and the vessel were third parties. Neither was shielded from liability by the exclusivity of the compensation remedy, and neither was barred from seeking contribution against the other. The judgment was presumably joint and several. The injured worker was therefore able to recover 100% of his judgment against either third-party tortfeasor.
 Although it is true that the ship was able to recoup a part of the judgment by virtue of the independent stevedore's comparative fault and that this would not have been possible if the ship had acted as its own stevedore, that is simply because the division of roles in Doca resulted in a larger number of third-party tortfeasors. It did not affect the amount the plaintiff was entitled to recover. If the plaintiff in Doca had been the employee of the independent stevedore, the full liability would have fallen on the ship, without right of contribution. See 33 U.S.C. § 905(b) (overruling Ryan indemnity).