*Corman Marine Construction, Inc., et al. v. Matthew F. McGeady, et al.*, No. 1452, September Term, 2023. Opinion by Ripken, J.

**WORKERS' COMPENSATION – LONGSHORE AND HARBOR WORKERS' COMPENSATION ACT – DUAL STATUS OF OWNER AND EMPLOYER**

Under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), a dual capacity employer-vessel is liable to its covered employees only to the extent it breached its duties of care in its capacity as a vessel and cannot be held liable in tort due to negligence committed in its capacity as an employer. 33 U.S.C. § 905.

**WORKER'S COMPENSATION – LONGSHORE AND HARBOR WORKERS' COMPENSATION ACT – DUAL STATUS OF OWNER AND EMPLOYER**

A dual capacity employer-vessel is not liable to a covered employee under the LHWCA merely due to the presence of an agent or officer of a dual capacity defendant, absent evidence that the agent or officer was representing the dual capacity defendant specifically in its capacity as a vessel. 33 U.S.C. § 905(b).

**MARYLAND RULES – DISCRETION OF COURT– CONTROL OF CASE PRESENTATION**

Maryland Rule 5-611(a) grants a trial court broad discretion in exercising reasonable control over the mode and order of interrogating witnesses and presenting evidence. In the interest of ensuring the presentation is effective for the ascertainment of truth or in order to avoid the needless consumption of time, a trial court may properly impose time limits on the cross-examination of witnesses.

Circuit Court for Baltimore City
Case No. 24-C-19-006335

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1452

September Term, 2023

_____

CORMAN MARINE CONTRUCTION, INC.,
*ET AL.*

v.

MATTHEW F. MCGEADY, *ET AL.*
_____

Ripken,
Albright,
Wright, Alexander, Jr.,
   (Senior Judge, Specially Assigned)

JJ.

_____

Opinion by Ripken, J.

_____

Filed: August 1, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This case arises from a workplace accident in which Matthew McGeady ("McGeady") was injured while working aboard the *Xavier*, a floating crane barge owned jointly by his employer, Corman Marine Construction, Inc., and two related companies (collectively "Corman"). Subsequent to the accident, McGeady and his wife (collectively "Appellees"), filed suit in the Circuit Court for Baltimore City asserting damages pursuant to the Longshore and Harbor Workers' Compensation Act. At the conclusion of trial, a jury found Corman liable, and awarded Appellees damages for lost wages, medical expenses, pain, and loss of consortium. Corman noted this timely appeal. For the reasons to follow, we reverse the judgment of the trial court.

## ISSUES PRESENTED FOR REVIEW

Corman presents the following issues for our review, which we have condensed and rephrased as follows:[1]

I.    Whether the court erred by declining to grant Corman's motion for judgment on Appellees' claim asserting negligence of a vessel.

II.   Whether the court erred by imposing a time limit on the cross-examination of a witness.

---

[1] Condensed and rephrased from:
1. Was Corman entitled to judgment as a matter of law on the McGeadys' claim for "negligence of a vessel" under 33 U.S.C. § 905?
2. Did the trial court exceed its Rule 5-611(a) authority or abuse its discretion when on Day 8 it cut off Corman's examination of Mr. McGeady–based on its own assessment of disputed expert testimony–one hour after imposing a strict time limit and declining to give the instruction that facilitated the examination on Day 7?

**DISCUSSION**

I.  **THE CIRCUIT COURT ERRED IN CONCLUDING THAT THE RECORD CONTAINED EVIDENCE SUFFICIENT TO SUPPORT A CLAIM FOR NEGLIGENCE OF A VESSEL UNDER 33 U.S.C. § 905(b).**

A.  **Factual Background**

In December of 2016, during the course of his employment with Corman, McGeady suffered a serious injury. At the time of the injury, Corman owned and operated the *Xavier*, a floating crane barge which was moored to the bed of the York River in Virginia and constituted a stationary work platform. On the date of the incident, the *Xavier* was serving as the staging area for a construction project to install a sewer pipe in the York River. The day of McGeady's injury, Martin Corcoran ("Corcoran"), the president of Corman Marine Construction and the person in charge of the sewer pipe project, traveled to the *Xavier*. Corcoran went with the goal of speeding up the process of sinking the pipe, which had delayed the venture. At that time McGeady and at least one other coworker, the project foreman, were present on the *Xavier*.

The pipe had a pocket of pressurized air trapped within it, which required venting prior to the sinking of the pipe. On the day of the incident, one end of the pipe was on the shore and the other end was resting on the *Xavier*. The end of the pipe that was on the *Xavier* contained a pneumatic plug which, when activated, would expel the pressurized air inside of the pipe. Corcoran, who appeared to be agitated and hurried, ordered the construction foreman to remove the plug. Prior to giving this instruction, Corcoran had not read the plug's safety manual, did not establish a safety zone, and did not instruct any of the Corman employees where to be located during the procedure. Upon the foreman

2

removing the pressurized plug, the plug exploded out of the pipe, hitting the foreman in the chest, and knocking him backward into McGeady. McGeady was thrown to the ground and struck his head on the deck of the *Xavier*. He suffered a traumatic brain injury which required emergency surgery. The United States Coast Guard responded to the scene, and subsequently turned the investigation of the incident over to the Occupational Safety and Health Administration ("OSHA"). As a result of that investigation, OSHA generated a report indicating that Corman did not provide McGeady with safe working conditions. The OSHA report was admitted into evidence.

Following the workplace accident, McGeady applied for and received no-fault benefits under the federal Longshore and Harbor Workers' Compensation Act ("LHWCA" or "the Act").[2] Subsequently, Appellees brought an action against Corman for negligence pursuant to section 905(b) of the LHWCA.[3] A jury trial commenced. At the conclusion of evidence, Corman made a motion for judgment as a matter of law, asserting that Appellees had failed to introduce evidence by which a jury could conclude that Corman's negligence

---

[2] As we shall explain *infra*, a worker injured aboard a vessel who receives no-fault benefits pursuant to the LHWCA is typically precluded from pursuing a negligence claim against their employer. *See* 33 U.S.C. § 905(a). They may, however, bring a tort claim against the owner of the vessel for injury "caused by the negligence of a vessel[.]" *Id*. at § 905(b). Under the 'dual capacity' exception, where the employer and the vessel owner are one and the same, an injured worker may assert a claim against the employer/vessel owner notwithstanding the employee's recovery of no-fault benefits if the injury was caused by the negligence of the vessel. *See Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 528–32 (1983).

[3] Although McGeady's injury took place in Virginia waters, Appellees elected to file suit in Baltimore City, a venue where Corman regularly conducted business. *See* § 6-201(a) of the Courts and Judicial Proceedings of the Maryland Code. Appellees also initially brought a claim under the Jones Act, 46 U.S.C. § 30104, which was later dismissed.

3

arose out of its vessel operations. The court denied the motion. In so doing, the court noted that the record included the OSHA report, a stipulation that the *Xavier* was a vessel for the purposes of the Act, and that Corcoran, the president of Corman Marine Construction, was present on the vessel at the time of the accident.

Following the parties' closing arguments, the court instructed the jury. During the instructions the court informed the jury that under the LHWCA:

> A longshoreman and/or harbor worker is permitted to file a third party action against his employer if that employer is also the owner of the vessel and a longshoreman [and/or] harbor worker is injured due to the negligence of the vessel and those in charge of it, such as agents and operators of the owner of the vessel.

> This is known as dual capacity employment. A longshoreman and/or harbor worker cannot maintain a third party action against his employer if any negligence resulted solely from defendant['s] duties as the . . . employer rather than by defendant's duties as the vessel owner through the agents and operators of the vessel owner.

The court also instructed the jury that in order to prevail in their action, Appellees would need to prove that "the injury to Mr. McGeady was caused by the negligence of the vessel as described by case law, interpreting Section 905(b), thereby permitting a third party action." The court did not provide a definition of "negligence of the vessel" nor did it articulate how "duties as a vessel owner" are distinct from duties as an employer.

The verdict sheet reflected the jury's finding that "the negligence . . . was attributable to the vessel and those in charge of it[,]" and the jury awarded Appellees damages totaling $8,687,233.19. Corman made a motion for judgment notwithstanding the verdict and/or new trial, which was denied by the court. Additional facts will be included as they become relevant to the issues.

4

## B. The Parties' Contentions

Corman asserts that the court erred in failing to grant its motions for judgment and judgment notwithstanding the verdict, as Appellees failed to make a valid claim for "negligence of a vessel" under the LHWCA. Corman argues that although the Act allows an injured worker to maintain a negligence action against a dual capacity employer specifically in its capacity as vessel owner, Appellees failed to adduce evidence sufficient to allow a jury to determine that the injury occurred due to negligence in Corman's vessel capacity, as opposed to in its capacity as an employer. While Corman does not dispute that negligence occurred, it argues that McGeady's injury was solely the result of construction activities undertaken in Corman's capacity as an employer, and unrelated to the seaworthiness of the vessel.

Appellees disagree and urge this Court to affirm the denial of the motion for judgment and motion for judgment notwithstanding the verdict. They argue that the trial record contained evidence sufficient to allow a reasonable jury to determine that McGeady's injury occurred due to Corman's negligence as a vessel. Specifically, Appellees assert that the injury occurred while on a Corman-owned vessel, under the direction of a Corman employee, and during a project intended to further Corman's corporate interest. Thus, Appellees posit that, in the light most favorable to them, Corman's negligence can be attributed to Corman in its role as vessel owner.

## C. Standard of Review

We review de novo the court's denial of Corman's motion for judgment. *See Scapa Dryer Fabrics, Inc. v. Saville*, 418 Md. 496, 503 (2011). In so doing, we evaluate "the

5

evidence and reasonable inferences drawn from it in the light most favorable to the non-moving party." *Wallace & Gale Asbestos Settlement Tr. v. Busch*, 464 Md. 474, 486 (2019) (internal brackets, quotation marks, and citation omitted). We reverse a trial court's denial of a motion for judgment notwithstanding the verdict only where "the facts and circumstances permit but a single inference as relates to the appellate issue presented." *Exxon Mobil Corp. v. Albright*, 433 Md. 303, 333 (2013) (quoting *Jones v. State*, 425 Md. 1, 31 (2012)) (internal quotation marks omitted).

In the absence of controlling caselaw, in order to determine the application of a federal statute this Court likewise applies de novo review to ascertain the legislative intent in enacting the statute. *See Wheeling v. Selene Fin. LP*, 473 Md. 356, 373 (2021); *see also Pope v. State*, 284 Md. 309, 320 n.10 (1979); *Henry v. Gateway, Inc.*, 187 Md. App. 647, 664 (2009). Our primary purpose in interpreting statutory language is to "discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny." *Lockshin v. Semsker*, 412 Md. 257, 274 (2010) (citations omitted). In so doing, our analysis begins by "look[ing] to the normal, plain meaning of the language of the statute"; however, "[o]ur inquiry is not confined to the specific statutory provision at issue on appeal. Instead [t]he plain language must be viewed within the context of the statutory scheme to which it belongs[.]" *Westley v. State*, 251 Md. App. 365, 386–87 (2021) (quoting *Berry v. Queen*, 469 Md. 674, 687 (2020)) (internal quotation marks omitted). "That context may include the statute's 'relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language

6

before us in a given case.'" *Id*. at 387 (quoting *Berry*, 469 Md. at 687).

**D.      The Longshore and Harbor Workers' Compensation Act**

Originally enacted by Congress in 1927, the federal LHWCA, codified as 33 U.S.C. § 901 *et seq*., created a compensation scheme intended to benefit maritime workers injured while working in the navigable waters of the United States for whom recovery was unavailable through state workers' compensation statutes. *Hill v. Knapp*, 396 Md. 700, 706 (2007). The LHWCA guarantees an injured worker covered by the Act a specified amount of compensation, regardless of whether the injury was caused by the employer's negligence. *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 528–29 (1983).

In return for a "certain and prompt recovery for claims against employers" the Act exacted "trade-offs" from employees. *Stanley v. W. Md. Ry. Co.*, 301 Md. 204, 207 (1984). Specifically, while the Act allows employees to recover for workplace injuries irrespective of an employer's negligence or an employee's own fault, the LHWCA was intended to be the exclusive remedy for occupational injury. *Id*.; *see also* 33 U.S.C. § 905(a) ("The liability of an employer [under the Act] shall be exclusive and in place of all other liability of such employer to the employee[.]"). Through the Act's passage, Congress sought to "balance [] difficult policy questions" by permitting employees to avoid "the burden of maintaining costly litigation and run the risk of receiving no remuneration[,]" while at the same time capping limits on liability for employers. *Stanley*, 301 Md. at 213.

Although the Act explicitly precluded an injured employee from seeking additional remedies from their employer, it did allow for covered employees to pursue tort actions

7

against a third-party vessel, or the vessel's owners, for negligence. 33 U.S.C. § 905(a)-(b).[4]

However, in both allowing third-party negligence suits against vessels, and mandating no-fault recovery as the exclusive remedy against employers, the Act did not facially address situations where the vessel owner and the employer are the same entity, a status referred to as dual capacity. *See Jones & Laughlin Steel Corp.*, 462 U.S. at 528–32; *see also Bush v. Eagle-Picher Indus., Inc.*, 927 F.2d 445, 449 (9th Cir. 1991). Addressing the ambiguity, the Supreme Court of the United States determined that a plaintiff could only maintain a tort action against a dual capacity employer pursuant to section 905(b) of the LHWCA, notwithstanding the employee's no-fault recovery under section 905(a) the Act, if the injury occurred due to the defendant's negligence *in its capacity as a vessel*, and not

---

[4] In full, the portion of the Act concerning "negligence of a vessel" states:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed to provide shipbuilding, repairing, or breaking services and such person's employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel, no such action shall be permitted, in whole or in part or directly or indirectly, against the injured person's employer (in any capacity, including as the vessel's owner, owner pro hac vice, agent, operator, or charterer) or against the employees of the employer. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

33 U.S.C. § 905(b).

because of a breach of the defendant's duties in its capacity as an employer. *Jones & Laughlin Steel Corp.*, 462 U.S. at 528–32; *see also Peter v. Hess Oil V.I. Corp.*, 903 F.2d 935, 948 n.13 (3d Cir. 1990). Notably, to date, neither the Supreme Court of the United States nor Maryland's appellate courts have outlined specific factors delineating vessel negligence from employer negligence in dual capacity cases brought under 33 U.S.C. § 905(b).

Examining the legislative history of the Act, we note that Congress has twice amended the LHWCA from its original form. Prior to the first amendment of the Act, "the exclusivity of the employer's liability under section 905 had been severely undermined as a result of two Supreme Court decisions."[5] *Gravatt v. City of New York*, 226 F.3d 108, 116 (2d Cir. 2000) (citation omitted). By amending the LHWCA in 1972, Congress "made substantial changes to this framework." *Id.* The 1972 amendments "substantially increased" the statutory compensation to injured workers but eliminated workers' ability to recover from a vessel under the strict-liability doctrine of unseaworthiness; a vessel owner's right to indemnity from the employer was likewise precluded. *Id.* (citations

---

[5] The two cases were *Seas Shipping Co. v. Sieracki*, 328 U.S. 85 (1946), and *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.*, 350 U.S. 124 (1956). In *Sieracki*, the Court determined that vessels were liable to covered employees for injuries arising from a vessel's "unseaworthy" condition. 328 U.S. at 94–97. In *Ryan Stevedoring Co.*, the Court held that a vessel could seek indemnity from the covered employer for the employee's injury due to unseaworthiness. 350 U.S. at 132–35. Together, the result of these cases was that the employer "became indirectly liable in maritime tort to its injured longshoreman-employee under the no-fault doctrine of unseaworthiness," despite the Act's provision that an employer's exclusive liability to its injured employee came in the form of the statutory payments. *Gravatt v. City of New York*, 226 F.3d 108, 116 (2d Cir. 2000). "In effect, the injured employee could get tort damages from his employer despite the statutory proscription against suing his employer directly." *Id.*

9

omitted). Thus, the sole means of recovery from a vessel was by an employee bringing a negligence action. Section 905(b) of the Act was again amended in 1984, broadening a vessel's immunity from negligence liability for certain classes of employees. *Id.* at 117. As such, "Congress clearly intended that the 'vessel's liability is to be based on *its own negligence.*'" *Id*. (quoting H.R. Rep. No. 92–1441 (1972), *reprinted in* 1972 U.S.C.C.A.N. at 4704). In dual capacity cases, both Congress and the Supreme Court have been clear: "[T]he rights of an injured longshoreman . . . should not depend on whether he was employed directly by the vessel or by an independent contractor." H.R. Rep. No. 92–1441, at 4705, 1972 U.S.C.C.A.N. at 4705; *see also Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 266 (1979) ("[A]ll stevedores are to be treated the same whether they are independent or an arm of the shipowner itself.").

The amendments to the Act, which eliminated several avenues for recovery against a vessel, while increasing the no-fault statutory damages employees received, clearly evidenced a Congressional intent to allocate risk away from vessels, and toward employers. *See Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 97 (1994) ("The design of these changes was to shift more of the responsibility for compensating injured longshoremen to the party best able to prevent injuries: the stevedore-employer. . . . Subjecting vessels to suit for injuries . . . would threaten to upset the balance Congress was careful to strike[.]" (internal citation omitted)). The general thrust of subsequent federal caselaw has followed this premise, and courts have typically declined to expand an injured employee's recovery from their employer beyond that guaranteed by the statute. *See Levene v. Pintail Enters. Inc.*, 943 F.2d 528, 531 (5th Cir. 1991) ("The availability of a tort remedy for vessel

10

negligence is a limited exception to the . . . LHWCA, which . . . generally replaces negligence causes of action against employers with a system of predetermined, standardized benefits.") (footnote omitted); *see also Morehead v. Atkinson-Kiewit, J/V*, 97 F.3d 603, 613 (1st Cir. 1996) (*en banc*) ("We are not disposed to upset that balance by expanding the liability of employers that act simultaneously as vessel owners, when the statute does not call for such a reading and the Supreme Court has cautioned against it.").[6] Nevertheless, covered employees retain the right to sue a dual capacity employer for vessel negligence under the Act. 33 U.S.C. § 905(b); *Jones & Laughlin Steel Corp.*, 462 U.S. at 531–32.

In *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, the Supreme Court outlined three duties of care a vessel owner owes an independent stevedoring contractor. 451 U.S. 156 (1981). First, a vessel must exercise "ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety[.]" *Id.* at 167. Included in this duty is the requirement that a vessel owner warn maritime workers of hidden dangers posed by "the condition of the ship's gear, equipment,

---

[6] Although the Supreme Court of Maryland has not yet considered a dual capacity case under section 905(b), the Court has twice declined to expand an employer's liability beyond that contemplated by the LHWCA. *See Stanley*, 301 Md. at 212–13 (determining that receiving no-fault benefits under the Act precluded additional recovery under a separate federal statute, as to hold otherwise would be to "violate the exclusivity of remedy provisions of § 905(a) of the LHWCA, and permit [a litigant] to accomplish indirectly what he cannot do directly under the statute[,]" and "upset the intent of Congress to limit an employer's ultimate liability for maritime injury"); *see also Hill*, 396 Md. at 722 ("[T]he exclusivity provisions of the federal LHWCA are controlling and preempt negligence claims under the Maryland Workers' Compensation Act.").

tools, and work space[.]" *Id.* This duty is referred to as the "turnover duty." *See Howlett*, 512 U.S. at 98.

Second, although a vessel has no inherent duty to supervise or inspect a third-party employer's work, when it does "actively involve[] itself in the cargo operations" it can be liable for its own negligence which leads to an injury. *Scindia*, 451 U.S. at 167. Similarly, a vessel risks liability under this duty when "it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." *Id.* This duty is often referred to as the "active control duty." *Gravatt*, 226 F.3d at 121.

The third *Scindia* duty is the "duty to intervene." *See Scindia*, 451 U.S. at 175–76; *see also Howlett*, 512 U.S. at 98. Although a vessel is not generally liable in negligence because of dangers in areas under the principal control of the third-party employer, when a vessel owner acquires actual knowledge that "(1) a condition of the vessel or its equipment poses an unreasonable risk of harm and (2) the stevedore is not exercising reasonable care to protect its employees from risk[,]" a duty to intervene arises. *Gravatt*, 226 F.3d at 121 (citing *Scindia*, 451 U.S. at 175–76).

Notably, *Scindia* involved the traditional tripartite scenario with an independent third-party employer, and not the dual capacity relationship at issue in the instant case. 451 U.S. at 158. The Supreme Court of the United States has not yet addressed the extent to which these duties apply in dual capacity employment actions brought under 33 U.S.C. § 905(b). *See Morehead*, 97 F.3d at 605.

12

### E.  Vessel Negligence in Dual Capacity Cases

As no controlling caselaw exists to delineate the precise contours of vessel negligence liability under section 905(b), we turn to the federal courts for persuasive authority. *See Pope*, 284 Md. at 320 n.10; *see also Henry*, 187 Md. App. at 664.

*Castorina v. Lykes Bros. S.S. Co., Inc.* dealt with a longshoreman who was exposed to asbestos and not provided with adequate personal protective equipment by his dual capacity employer. 758 F.2d 1025, 1027 (5th Cir. 1985). The Fifth Circuit held that while the *Scindia* duties applied to dual capacity employers, those duties were "neither heightened nor diminished when the longshoreman is employed directly by the vessel." *Id.* at 1033. In declining to find vessel negligence under section 905(b), the *Castorina* court concluded that the dusty conditions of the ship were "open and obvious" and therefore, the *Scindia* duties did not apply, as "Lykes as vessel owner was entitled to rely on Lykes as stevedore to conduct the offloading operations properly." *See id.* at 1036.

The Fifth Circuit reaffirmed this principle in *Levene v. Pintail Enterprises, Inc.*, 943 F.2d 528 (5th Cir. 1991). Although agreeing that the *Scindia* duties applied in a dual capacity case, the court concluded that the mere presence of a captain in command of the vessel did not give the dual capacity defendant constructive control of the work area of the barge *in the capacity of vessel owner*. *See id.* at 535. In particular, the court determined that the accident "occurred not as the result of any defect in the [vessel], but at best was the result of a series of employment decisions[,]" and as such concluded that no violation actionable under section 905(b) of the LHWCA had occurred. *Id.* at 535–36.

Similarly, the First Circuit concluded in *Morehead v. Atkinson-Kiewit, J/V* that the

13

*Scindia* duties apply "insofar as the facts allow" in dual capacity cases. 97 F.3d at 613. In determining if negligence can be applied to a dual capacity employer, "[a] court may have to divide the employer-shipowner into a hypothetical independent employer and independent vessel owner, each separately holding the duties allocated under principles suggested in *Scindia*." *Id*.

*Morehead* involved a bridge construction worker who, while working on a barge owned by his employer, fell into a hatch that had been left open by a fellow employee. *Id*. at 614. The First Circuit applied the *Scindia* framework and concluded that the dual capacity employer, which had construction supervisors aboard the vessel, but no separate maritime captain or crew, was liable in its capacity as an employer, not as a vessel. *Id*. ("The vessel, or the employer in its vessel capacity, is not implicated except in the unusual circumstance that the vessel itself continues to exercise active control over the work area."). The court determined that *Scindia*'s active control duty did not apply to the barge, which was being used as a construction worksite, and a hatch negligently left ajar on the orders of a construction supervisor during a construction project, could not be imputed to the employer in its capacity as a vessel owner. *Id*. at 616. Sitting *en banc*, the First Circuit noted that to decide otherwise would be to "greatly expand a defendant's liability qua vessel" in dual capacity cases. *Id*. at 615.

The Second Circuit has likewise addressed the distinction between vessel negligence and employer negligence under the Act. *See Gravatt*, 226 F.3d at 114. *Gravatt v. City of New York* involved an appeal from a final judgment where an employee was injured while unloading construction materials and re-loading construction debris onto a

14

materials barge owned by his employer. *Id.* at 111–13. The Second Circuit concluded that the injury, which resulted from the negligent manner in which the materials were moved on and off the barge by a crane, was attributable to the employer's performance of construction work. *Id*. at 125. This, in the court's view, was separate from the barge's purpose as a vessel, which was to ferry building materials *between* work sites. *Id*. at 125–26.

The *Gravatt* court noted that at the time of the accident, the barge was stationary and "[a]ll the personnel working on the crane barge were engaged in bridge repair; none was engaged in seafaring work." *Id.* at 113, 126. In evaluating the role of the *Scindia* duties, the court specifically noted that although the dual capacity employer "had 'active control' over the barge, and 'actual knowledge' of the negligent conduct, those facts are not sufficient to render it liable, unless that active control or actual knowledge *was in its role as vessel owner*." *Id.* at 128 (emphasis added). Specifically, the court noted that to hold otherwise, and impose *Scindia* duties in all cases in which an accident occurred onboard a ship owned by a dual capacity defendant, would "be contrary to the express intent of Congress, which sought generally in drafting section 905(b) to provide the same result regardless whether the covered work was performed by an independent contractor or by the ship through personnel it hired directly to perform it." *Id.* at 123 (citing H.R. Rep. 92–1441, 1972 U.S.C.C.A.N. at 4705). Ultimately, although the court noted that "[i]t may be viewed as an unhappy result" to limit the recovery of a worker injured by the negligence of his dual capacity employer to the worker's statutory compensation payment, "that is the intent of workers' compensation laws and it is the result intended by Congress under the

15

LHWCA." *Id*. at 126.

While Maryland courts have not directly addressed the issue, numerous other courts have accepted the premise that to successfully maintain an action under section 905(b), a plaintiff must present evidence that the negligence was in some way specifically related to the defendant's capacity *as a vessel*, and not merely bootstrapped by the fact that the defendant is a dual capacity employer. *See McConville v. Reinauer Transp. Cos., L.P.*, 16 A.D.3d 387, 389 (2d Dep't 2005) (noting that in a dual capacity case brought in a New York state court, the question of whether the negligence occurred in the capacity of employer or vessel owner "turns, preliminarily, on whether the accident was the result of human error on the part of an employee engaged in non-vessel related work . . . or of a defect or malfunction in the ship's equipment"); *Daggs v. Martin*, 851 So.2d 1190, 1193 (La. Ct. App. 2003) (affirming the dismissal of a vessel negligence claim in a dual capacity case brought in a Louisiana state court where the plaintiff was struck by a piece of construction equipment, as "the construction work was separate and apart from the work of the vessel[,]" and there was "no evidence in the record that the barge or anyone present at the site was engaged in vessel duties at the time of the accident"); *Doty v. Tappan Zee Constructors, LLC*, 831 Fed. Appx. 10, 13 (2d Cir. 2020) (affirming summary judgment for the dual capacity defendant when the alleged vessel negligence involved the plaintiff falling while repairing a crane on a stationary barge, as the "allegedly dangerous condition was related to [defendant's] work as a construction company, not as vessel owner"); *Dean v. McKie Co.*, 771 F. Supp. 466, 476 (D. Mass. 1991) (granting summary judgment, as "[i]n order to hold the vessel owner liable, there must be some condition of the vessel that

16

caused or contributed to the plaintiff's injury"); *Brown v. McKinnon Bridge Co., Inc.*, 732 F. Supp. 1479, 1485–86 (E.D. Tenn. 1989) (holding that a section 905(b) claim could not proceed because "the injury [plaintiff] suffered was wholly unrelated to any negligent condition on a barge").

In so holding, federal and state courts alike have rejected the idea that a dual capacity employer can be liable for vessel negligence due merely to its presence or control of the scene of the accident in the capacity of an employer. In sum, courts have concluded that there must be some nexus between the negligent act and either the physical character of the vessel or other exclusively vessel-related operations.

Where courts *have* found a genuine issue of fact to be determined by a jury, they have routinely focused on the physical vessel creating the hazardous condition. *See Halpin v. Atkinson-Kiewit, J.V.*, 894 F. Supp. 486, 493 (D. Mass. 1995) (denying a defendant's motion for judgment where evidence showed that lines connecting a barge to another vessel were too slack, allowing excess movement of the barge); *see also White v. Cooper/T. Smith Corp.*, 690 F. Supp. 534, 539–40 (E.D. La. 1988) (denying dual capacity defendant's motion for summary judgment where plaintiffs alleged "something was physically wrong with the [vessel]"); *Scheuring v. Traylor Bros., Inc.*, 476 F.3d 781, 790–91 (9th Cir. 2007) (reversing trial court's grant of summary judgment for dual capacity defendant where there was genuine issue of material fact as to whether the ramp connecting a barge to the shore was "more like a gangway than a dock or pier[]").

**F.** **Section 905(b) Liability Does Not Attach Absent Negligence in the Capacity of a Vessel Owner.**

This Court is persuaded by the holdings of the First, Second, and Fifth Circuits that for a dual capacity employer to be liable for negligence of a vessel under section 905(b) of the LHWCA, any negligence must be borne out of actions taken in the defendant's capacity as a vessel. *See supra*, Section I.D. We, likewise, agree with the *Gravatt* court's conclusion that, to the extent that *Scindia* duties apply to a dual capacity defendant pursuant to the Act, any active control over an area of the vessel, ability to intervene to prevent harm to an employee, or actual knowledge of a dangerous condition must occur specifically in the defendant's capacity as a vessel owner. *See Gravatt*, 226 F.3d at 128; *see also Levene*, 943 F.2d at 535; *Morehead*, 97 F.3d at 613–14.

To hold otherwise would run counter to the clear direction of both Congress and the Supreme Court of the United States that an injured worker's rights should be neither limited nor broadened merely because of their employer's simultaneous status as shipowner. *See* H.R. Rep. No. 92–1441, 1972 U.S.C.C.A.N. at 4705; *see also Edmonds*, 443 U.S. at 266. The plain language of the Act states that "[t]he liability of an employer . . . shall be exclusive and in place of all other liability of such employer to the employee[.]" 33 U.S.C. § 905(a). Where no cause of action under section 905(b) would be tenable pursuant to the traditional tripartite relationship between vessel, employer, and maritime worker, we are persuaded that no expanded liability attaches to the vessel merely because of its dual

18

capacity status as both shipowner and employer of the maritime workers aboard.[7] *See Morehead*, 97 F.3d at 615.

### G.     Analysis

As we turn to the instant case, a brief recitation of what is *not* at issue is useful. The parties agree that at the time of his injury, McGeady was a longshoreman covered by the LHWCA, that Corman was his employer, and that the *Xavier* was a vessel located in navigable waters. They further agree that the *Xavier* was a stationary work platform moored to the riverbed, and its purpose was to serve as a staging area for a construction project which involved sinking a sewer pipe into the water. Likewise, the parties do not dispute that Corcoran, the president of Corman Marine Construction, personally directed the project and gave the order to deflate the pneumatic plug, the event which resulted in McGeady's injury. Thus, we must only determine if sufficient evidence was adduced at trial to allow a determination that Corcoran's action in directing the deflation of the plug could be imputed to Corman in its capacity as a *vessel owner*, as opposed to as an *employer*.

Appellees contend that the proper test for vessel negligence involves showing that "a supervisory agent of the dual-capacity vessel owner," while on a vessel, committed a

---

[7] This conclusion is supported by the legislative history of the Act. As noted *supra*, the LHWCA has been twice amended to reduce the ability for a covered employee to recover from a dual capacity employer in an amount in excess of the prior statutorily guaranteed benefits. *See Gravatt*, 226 F.3d at 117. ("In amending section 905(b) Congress clearly intended that the 'vessel's liability is to be based on *its own negligence*.'" (quoting H.R. Rep. No. 92–1441, at 4704) (emphasis added in *Gravatt*)). Similarly, our Supreme Court has concluded that, in the context of the Act, "[p]roviding claimants an opportunity to pursue a separate claim when legislation is already tailored and in place would work an impermissible tour de force on the entire workmen's compensation scheme." *Stanley*, 301 Md. at 213.

negligent act which related to the task and purpose of the vessel or in furtherance of the vessel owner's corporate interest or motivation. It is Appellees' position that Corcoran, as president of Corman Marine Construction, "took charge of, oversaw and directed a critical operation . . . to weld and sink a sewer pipe into the York River." Thus, in Appellees' view, because of Corcoran's presence on the *Xavier* as the supervisory agent of a dual capacity defendant, he was inherently present in his capacity as a vessel supervisor, and his negligent conduct was "attributable to the vessel[.]" Appellees also contend that Corcoran's purpose in negligently directing the removal of the plug was motivated by "corporate concern[,]" which they argue allows imputation of his actions to Corman's capacity as a vessel.

Appellees cite two cases they contend support their definition of vessel negligence, *Pichoff v. Bisso Towboat Co., Inc.*, 748 F.2d 300 (5th Cir. 1984), and *Smith v. Eastern Seaboard Pile Driving, Inc.*, 604 F.2d 789 (2d Cir. 1979). However, both are distinguishable from the instant case. *Pichoff* involved a harbor worker who, while repairing a leaking fuel tank in an area of the ship that had no permanent lighting, slipped in a pool of fuel and suffered a back injury. 748 F.2d at 301–02. The Fifth Circuit concluded that under the LHWCA, the dual capacity defendant could be liable in its capacity as shipowner, because the "corporate concern" of being unable to provide a working vessel to a client if the repair work was not timely completed was "at least partly in [the] capacity as representative of the vessel owner[.]" *Id.* at 303. However, we note that the corporate concern in *Pichoff* was borne out of a physical problem with the vessel, and the instrumentality of the harm—insufficient lighting combined with a fuel leak—clearly

20

relates to the character of the *vessel*. *Id*. at 301–02. Thus, *Pichoff* is distinct from the instant case, where McGeady's injury was wholly unrelated to the *Xavier*'s physical character as a vessel, and Corman's corporate concern in the removal of the pneumatic plug was related to quickly completing a *construction project*, not remedying a physical defect in the vessel.

Appellees' citation to *Smith* is no more persuasive. 604 F.2d 789. In *Smith*, the Second Circuit was confronted with a section 905(b) action brought by the estate of an employee who drowned while inspecting a damaged vessel. *Id*. at 792. The court held that the death could be attributable to the dual capacity defendant in its capacity as a vessel, because "[t]he absence of a rescue plan, the improper placement of emergency apparatus, and the failure to provide a ladder or platform were all defects in the general operation of the tug[.]" *Id.* at 796. Issues such as a vessel's insufficient water rescue plan or equipment are clearly related to the character of the vessel itself, irrespective of the mission employees on board are attempting to complete.

The *Smith* court also noted that, although the company president of the dual capacity defendant was aboard when the accident occurred, he was present specifically in his supervisory capacity as shipowner, and because in that capacity he should have known about the dangerous physical condition of the vessel, the negligence could be imputed to the defendant in its capacity as a shipowner. *Id.* at 797. This is distinct from the case at bar, where Corcoran was explicitly on board the *Xavier* to supervise a construction project, not monitor a stationary work platform.

Ultimately, neither *Pichoff* nor *Smith* stands for the principle that either corporate concern, or the mere presence of a supervisor in the employ of the dual capacity defendant

21

is inherently sufficient to give rise to vessel negligence. Indeed, this premise has been soundly rejected by later federal circuit court rulings. *See Gravatt*, 226 F.3d at 128; *Morehead*, 97 F.3d at 613. Rather, the injuries in *Pichoff* and *Smith* both arose from dual capacity defendants' negligence related to the physical condition of a vessel. *Pichoff*, 748 F.2d at 301–02; *Smith*, 604 F.2d at 796. By contrast, here, McGeady's injury was solely the result of a construction accident unrelated to the physical character of the *Xavier*.

As we have stated above, in order to maintain a section 905(b) action against a dual capacity employer, a plaintiff is required to present evidence showing that the negligence occurred specifically in the defendant's capacity as a vessel. *See supra*, Section I.E. From a review of the record before us, we determine that Appellees, even in the light most favorable to their position, adduced no such evidence at trial.

Corcoran's testimony indicated that the day of the incident, he had been supervising the land-based construction on the York River sewage project, and "decided to go [to the vessel] because that was the next phase of the work[,]" and because he had been specifically asked by the construction foreman to "help [the foreman] out" aboard the *Xavier*. Corcoran described his role as "oversight for the overall project" and "helping with the directing of the work." He explained that the reason he gave the order to pull the plug was because they needed to try to get the air out of the pipe. Corcoran also testified that the reason he instructed an employee to depressurize the plug was because that specific employee was the construction foreman. At the time the incident occurred, the *Xavier* was affixed to the bottom of the York River, and the only individuals aboard were "marine construction workers." Corcoran testified that the people who operate the tugboat, which would have

22

been required to move the *Xavier*, were "a separate crew" who were not aboard the vessel. There is no allegation that the pipe or the plug were part of the *Xavier*, or that the plug depressurized for any reason other than that Corcoran specifically ordered a construction foreman to remove it as part of a construction project. Simply put, the injury McGeady suffered was wholly unrelated to any negligent condition on the *Xavier*, and but for the happenstance of his employer's dual capacity status, no section 905(b) action would have been plausible.

Here, when we "divide the employer-shipowner into a hypothetical independent employer and independent vessel owner" and consider the evidence in the light most favorable to Appellees, there is no support for the contention that Corcoran was aboard the *Xavier* in his capacity as the representative of the shipowner. *Morehead*, 97 F.3d at 613. As in *Gravatt*, all personnel aboard the vessel were engaged in construction work, not seafaring duties, and the platform was stationary. 226 F.3d at 113, 125–26. Like the injury in *Morehead*, the specific cause of McGeady's injury was an act of negligence performed by a construction employee during work on a construction project. 97 F.3d at 616. Similarly, the injury occurred when no separate maritime captain or crew was aboard. *Id.*

In the absence of any evidence tending to show that Corcoran was specifically present on the vessel in his capacity as an agent of the vessel owner—that is, to oversee the *Xavier* as a physical work platform—as opposed to in his capacity as manager of a construction project, we cannot say that a reasonable factfinder could reach the conclusion that at the time Corcoran gave the order to depressurize the plug, his conduct was attributable to Corman as a vessel owner. For the same reason, a reasonable factfinder

23

could not conclude that Corcoran's mere presence as a construction supervisor resulted in Corman, as vessel owner, obtaining either active control over the vessel, or actual knowledge of a dangerous condition. *See Levene*, 943 F.2d at 535.

For the reasons articulated above, we determine that, even when viewed in the light most favorable to Appellees, no evidence was adduced at trial that would enable a reasonable factfinder to determine that McGeady's injury was the result of vessel negligence within the meaning of the LHWCA, and consequently, Corman's motion for judgment should have been granted. *Exxon Mobil Corp.*, 433 Md. at 333. To hold otherwise would be to abrogate the policy bargain Congress struck in promulgating the LHWCA and contravene the guidance of the Supreme Court of the United States that the rights of workers covered under the Act should not depend on the dual capacity status of their employer. *See Howlett*, 512 U.S. at 97; *Edmonds*, 443 U.S. at 266–67; *see also Morehead*, 97 F.3d at 613 ("We are not disposed to upset that balance by expanding the liability of employers that act simultaneously as vessel owners, when the statute does not call for such a reading and the Supreme Court has cautioned against it.").

## II. THE CIRCUIT COURT DID NOT ERR IN LIMITING CORMAN'S CROSS-EXAMINATION OF MCGEADY PURSUANT TO MARYLAND RULE 5-611(a).

Although we determine that the court erred in denying Corman's motion for judgment, to provide future courts and litigants with guidance on the application of the Maryland Rules, we nevertheless take this opportunity to address Corman's second question, which concerns the degree of control over trial proceedings afforded to a trial court by Rule 5-611(a). *See Cottman v. State*, 395 Md. 729, 745 (2006).

### A. Factual Background

#### 1. *The expert witnesses' trial testimony*

At trial, both parties introduced expert witnesses who opined about McGeady's mental state following his injury aboard the *Xavier*. Corman introduced an expert in neurology who testified that he had reviewed McGeady's medical history and deposition transcripts, as well as personally interviewed McGeady prior to preparing a report. Appellees introduced two medical experts who likewise had examined McGeady's medical records, as well as interviewed him personally. While both parties' experts agreed that McGeady had suffered a traumatic brain injury resulting from his accident aboard the *Xavier*, they disagreed about the extent of the injury, and McGeady's degree of recovery from that injury. Appellees' experts noted that McGeady had significant ongoing challenges related to his ability to interact appropriately with others, specifically in his ability to respond to others relevantly, cooperatively, and calmly, which they attributed to the brain injury he sustained from the accident on the *Xavier*. Corman's expert largely agreed with Appellees experts' observations about how McGeady's mental health challenges affected his present behavior but contended that the cause of McGeady's difficulties was unrelated to his injury on the *Xavier*.

#### 2. *McGeady's trial testimony*

When McGeady was called as a witness on the seventh day of trial, he presented symptoms consistent with the characterizations made by both parties' expert witnesses. In response to Appellees' question "where did you grow up[,]" McGeady gave a long and disjointed answer. Appellees' counsel noted in a bench conference that his rationale for

25

calling McGeady was because counsel "wanted the jury to see how severe [McGeady's] injuries were."

Corman disputed the propriety of presenting McGeady in such a fashion. In response, the court noted that while Corman's own expert had testified that McGeady's mental state was not attributable to a traumatic brain injury, there had been no challenge to the "medical and mental condition" of McGeady. The court further clarified: "I don't think there's any doubts, as I indicated, from your own experts that Mr. McGeady is suffering from some medical and mental health condition."

The parties and the court agreed that McGeady was competent to testify, and Corman's counsel elected to cross-examine him. The court noted that it would "advise Mr. McGeady . . . to try to limit his answers to the questions that you're asking. If it's cross-examination, I'm hoping you're asking yes/no questions [] where he can limit his answers." The court noted that "If Mr. McGeady is unable to - - well, I'll leave it at that and I'll reconsider based on what I see whether that testimony can continue."

The court, outside the jury's presence, also instructed McGeady that he should attempt to limit his answers to either yes or no, or to no more than one sentence. Additionally, the court informed McGeady if necessary, it would "step in and say that's enough, next question." For more than an hour, with the diligent assistance of the court, McGeady answered Corman's questions. During this period, Corman asked McGeady open ended questions, primarily concerning McGeady's past work experience; Corman's counsel did not inquire regarding the day of McGeady's injury, or his subsequent experience. Although McGeady did respond to some of counsel's questions, he also

26

routinely provided lengthy answers that were not necessarily responsive and was frequently redirected by the court. After slightly more than an hour of cross-examination, the parties approached the bench, and Corman's counsel informed the court that "an hour to an hour and a half" of additional cross-examination would be needed. The court adjourned until 9:00 A.M. the next day.

The following day McGeady again gave lengthy and substantially non-responsive replies to Corman's open-ended cross-examination questions, which again did not initially concern the incident or its effects. To its credit, the court frequently attempted to redirect McGeady by saying "next question[.]" Following a particularly long non-responsive answer, the court summoned counsel to the bench. The court noted that Corman's counsel was "not even asking [McGeady] leading questions[,]" and stated: "[T]his is going on for an extended period of time. I'm going to put a time limit on your cross-examination and then you can do whatever you want with it. How much time do you need?" Counsel stated that, in line with his statement at the end of the previous day, he would need an hour to an hour and a half of additional time, hence, cross-examination would be warranted until 10:30 A.M. The court agreed to the request.

Shortly after, Corman's counsel approached the bench, and requested that the court re-instruct McGeady outside the presence of the jury, as had occurred the previous day. The court, while noting that it had been interjecting in line with the previously established system, declined to provide an additional instruction outside the presence of the jury. Cross-examination resumed, and the court continued its active attempts to keep McGeady focused on Corman's questions. McGeady continued providing testimony that was

27

primarily non-responsive.

Eventually, the court called for another bench conference, and informed Corman's counsel that his allotted time had elapsed. Corman sought to continue questioning McGeady, to which Appellees objected. Corman's counsel asserted that "no rule" prevented him from questioning McGeady for an extended period of time and moved for a mistrial.

The trial court disagreed with Corman that it could not restrict the amount of time McGeady could be cross-examined and then explained the court's reasoning for implementing the restriction. The court noted that the parties had initially indicated seven days would be required for trial, however, that time had already been exceeded. The court noted that it had "carefully observed" McGeady, as well as listened to the expert testimony, and stated that McGeady's issues with focus and responding directly to questions were apparent, and that McGeady was far more agitated than he had been the previous day. The court also specified that Corman's counsel "asked little to no leading questions[,]" and had "almost no ability to control this witness." The court continued, saying that after McGeady "would talk for as long as five to six minutes," Corman's only follow up question was "'[k]eep going.'" The court observed that pursuant to the Maryland Rules the court could place limits on cross-examination, and impose time limits, which were those to which Corman's counsel had previously agreed. Finally, the court indicated that there were "extenuating circumstances given the condition of the witness[,]" and mandated that the cross-examination of McGeady be concluded.

### B. The Parties' Contentions

Corman contends that the trial court erred in imposing a time limit on McGeady's testimony pursuant to Maryland Rule 5-611(a). Specifically, Corman asserts that the trial court improperly used Rule 5-611(a) to "exclude relevant evidence from a competent witness." Corman argues that placing a time limit on McGeady's testimony failed to protect McGeady from undue harassment or embarrassment, did not further the goal of an effective ascertainment of the truth, and did not constitute a reasonable accommodation which would allow McGeady to testify. Thus, in Corman's view, in declining to reinstruct McGeady outside the presence of the jury during the second day of his testimony, and by "t[aking] sides in a credibility contest" when noting the court's impression of McGeady's behavior, the court had abused its discretion.

Appellees disagree and assert that the court did not abuse its discretion in controlling McGeady's trial testimony. Appellees dispute the characterization that the court "excluded" McGeady's testimony under Rule 5-611(a), contending that the court merely imposed reasonable limits on a "lengthy and unhelpful examination." Nor do Appellees accept Corman's contention that the court's actions did not constitute a reasonable accommodation; rather, Appellees assert that the court employed an accommodation for McGeady's condition by interjecting to move the testimony forward. Appellees argue that the court did not "take sides" in a "credibility contest" related to McGeady's mental state and note that both parties' experts agreed that McGeady suffered from a mental health condition, and the only dispute was the *cause* of that condition. Finally, Appellees observe that Corman was permitted to cross-examine McGeady for two and a half hours, and also

29

submitted 11 hours of discovery deposition testimony into the record.

### C.  Standard of Review

We review the trial court's control over the presentation of witness testimony for abuse of discretion. *Applied Indus. Techs. v. Ludemann*, 148 Md. App. 272, 289 (2002) ("[T]he course and conduct of trial is left to the sound discretion of the trial court and its decisions in this regard will not be reversed absent abuse."); *see also AC and S, Inc. v. Abate*, 121 Md. App. 590, 671 n.48 (1998), *abrogated in part on other grounds by John Crane, Inc. v. Scribner*, 369 Md. 369 (2002). As the Supreme Court of Maryland has stated, "[m]anaging the scope of cross-examination is a matter that falls within the sound discretion of the trial court." *Simmons v. State*, 392 Md. 279, 296 (2006). Additionally, "where a trial court's ruling is reasonable, even if we believe it might have gone the other way, we will not disturb it on appeal." *Fontaine v. State*, 134 Md. App. 275, 288 (2000).

### D.  Analysis

Maryland Rule 5-611(a) states that a court "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Although Corman is correct that Rule 5-611(a) does not in and of itself regulate the exclusion of evidence, we disagree with Corman's contention that the court excluded admissible evidence under the Rule.

The court did not apply Rule 5-611(a) in a manner that was tailored to prevent any specific portion of McGeady's testimony from reaching the jury. Rather, because

30

McGeady's testimony regarding unrelated topics had been "going on for an extended period of time[,]" the court placed a time limit on the cross-examination, and informed Corman's counsel, approximately one and a half hours before its expiration that he "[could] do whatever [he] wanted with" the remaining time. Under the court's ruling, Corman had two and a half hours to cross-examine McGeady about any potentially relevant topic, and Corman's counsel both specifically suggested as well as acquiesced to the time limit. Moreover, at the point the court made the ruling, the case had already extended well beyond its scheduled duration. Because the record demonstrates that the court was "avoid[ing] the needless consumption of time[,]" and ensuring an effective presentation of evidence, we reject Corman's contention that the trial court erroneously used Rule 5-611(a) as a rule of exclusion.[8] *See* Md. Rule 5-611(a).

Corman's contention that Rule 5-611(a) compelled the court to re-instruct McGeady on the eighth day of trial fares no better. That day, the court observed an increased agitation in McGeady and noted that although the court had attempted repeatedly to interrupt McGeady to get him to move to the next question, "it didn't seem to be working." The court declined Corman's request to clear the jury from the courtroom and reinstruct

---

[8] To be sure, a trial court may abuse its discretion by terminating cross-examination "without first informing itself of facts essential to its ruling[.]" *Lewis v. State*, 71 Md. App. 402, 410–11 (1987). By contrast, in the instant case, the court noted it had carefully observed McGeady, and understood how his condition affected his testimony. Moreover, the court stated that it had observed that Corman's counsel had "almost no ability to control" McGeady and had "asked little to no leading questions." Here, the court did not fail to inform itself of facts needed to reach the conclusion that further testimony would have likely been unhelpful and contrary to Rule 5-611(a)'s goals of avoiding wasted time and the ineffective presentation of evidence.

McGeady to limit his answers. However, the court agreed to continue the system of attempting to prompt McGeady to move to the next question and diligently proceeded to do so.

Corman advances the theory that a reinstruction outside the presence of the jury was a "reasonable accommodation" for McGeady's disability that the court was required to provide. We disagree. "The conduct of [a] trial must of necessity rest largely in the control and discretion of the presiding judge," and in the absence of an abuse of discretion, we will not interfere with the court's judgment that (1) McGeady required an accommodation, and (2) the granted accommodation was sufficient under the circumstances. *Thomas v. State*, 143 Md. App. 97, 109–10 (2002) (internal quotation marks and citation omitted). Here, on both days of his testimony, the court elected to grant an accommodation in the form of the trial judge interjecting to assist McGeady in focusing on the next question. On the second day of his testimony, the court observed that McGeady was especially agitated and difficult to control, that Corman's counsel had not been asking McGeady leading questions, and instead had been allowing McGeady to discuss tangential topics at length. Under the circumstances, the court's decision to continue applying an accommodation, without also reinstructing McGeady outside the presence of the jury was well within the court's discretion. *See Bellamy v. State*, 119 Md. App. 296, 304 (1998) ("[A] trial judge has great discretion in controlling the conduct of a trial.").

Nor do we agree with Corman's contention that the court "took sides on a credibility contest" between experts. Specifically, Corman takes issue with the court's observation, made outside the hearing of the jury, that McGeady "has no ability to stop when a question

is posed to him[,]" and was "largely unable to respond directly to questions that are asked." Corman attempts to analogize this statement to a trial court's reversible error in *Frankel v. Deane*, 480 Md. 682 (2022), but the comparison is unavailing. The error in *Frankel* arose in the context of a Rule 5-702 admissibility hearing and involved a court impermissibly making a credibility determination when a doctor's medical records directly contradicted the testimony of a patient. *Id*. at 701–04. By contrast, here, the court merely placed its own direct observations of McGeady's *behavior at trial* on the record and did not make a factual finding as to his diagnosis or level of disability.

Additionally, it does not appear from the record that there was a meaningful difference of opinion between the parties' experts as to the nature of McGeady's mental health condition as it relates narrowly to this issue. At no point did Corman's expert disagree with Appellees' experts that McGeady was suffering from mental dysfunction; rather, Corman's expert merely challenged the *cause* of such a condition.[9] The court's comment explained the ruling in part by acknowledging in-court behavior which was clear from the record and consistent with expert testimony from both parties. This was well within the permissible exercise of its discretion.

For the reasons articulated above, the court did not abuse its discretion in controlling either the presentation of testimony, or the course and conduct of trial. *See Ludemann*, 148 Md. App. at 289; *see also* Md. Rule 5-611(a). However, because we determine that

---

[9] As Corman notes, the degree to which McGeady was prevented from working by his condition was at issue in the case, but both parties acknowledged, and it is clear from the record, that McGeady exhibited serious behavioral challenges at trial.

Appellees failed to adduce evidence allowing a reasonable inference that McGeady's injury was attributable to vessel negligence, we nevertheless reverse the judgment of the trial court.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. COSTS TO BE PAID BY APPELLEES.**